Argued and submitted February 3, affirmed September 29, 2010, petition for review denied February 3, 2011 (349 Or 602)

FRED SHEARER & SONS, INC.,
an Oregon corporation,
*Plaintiff-Respondent,*

*v.*

GEMINI INSURANCE COMPANY,
a Delaware corporation,
*Defendant-Appellant.*

GEMINI INSURANCE COMPANY,
a Delaware corporation,
*Counterclaim Plaintiff,*

*v.*

FRED SHEARER & SONS, INC.,
an Oregon corporation,
*Counterclaim Defendant.*

Multnomah County Circuit Court
0507-07126; A136818 (Control), A140007

240 P3d 67

469-a

Todd S. Baran argued the cause and filed the briefs for appellant.

John L. Langslet argued the cause for respondent. With him on the brief were Joan L. Volpert and Martin, Bischoff, Templeton, Langslet & Hoffman LLP.

Before Landau, Presiding Judge, and Schuman, Judge, and Ortega, Judge.

SCHUMAN, J.

## SCHUMAN, J.

Defendant Gemini Insurance Company insured TransMineral USA, a distributor of a stucco product. Plaintiff Fred Shearer & Sons, Inc. (Shearer) installed that product on the exterior of a residence. The product allegedly failed, and the property owners sued their general contractor who, in turn, sued Shearer and TransMineral. Shearer then tendered the defense of that underlying action to Gemini, on the theory that the policy issued by Gemini to TransMineral contained an endorsement that also required Gemini to cover "vendors" of TransMineral products, and that Shearer was such an entity. Gemini rejected the tender, and Shearer brought this action seeking, among other relief, a declaration that Gemini owed Shearer a duty of defense. The trial court granted Shearer's motion for partial summary judgment to that effect, and, after a trial on stipulated facts, entered a limited judgment against Gemini, which it now appeals. We affirm.[1]

Although the facts themselves are undisputed, there is a question in this case as to which of those facts properly may be considered when determining the duty to defend. We discuss that issue below and resolve it in favor of the more inclusive position. 237 Or App at 474-78. The following recitation reflects that determination.

In May 2000, Walsh Construction Co. entered into a contract with the Evenstads to perform various repairs to their residence. Walsh then subcontracted with Shearer to apply stucco to the exterior of the residence, which Shearer did. Sometime after the repairs were completed, the Evenstads discovered cracking in the stucco, and they eventually filed an action against various defendants, including their general contractor, Walsh. The factual allegations in that complaint included the following:

"After the repairs were completed, the [Evenstads] began to notice cracking of the stucco and were told by * * * Walsh and Shearer that such cracking was normal and

---

[1] Gemini also appeals a general judgment that was subsequently entered, but it concedes that the issues regarding the limited judgment are dispositive as to both appeals.

to be expected. Plaintiffs became more concerned as the cracking continued and they began to notice leaking and mold[.] * * *.

"* * * * *

"While the plaintiffs have not yet obtained bids for performing the repairs that will be necessary, their preliminary estimate is that the total costs of the design and repair work will be approximately $1.5 million. The [Evenstads] will amend this Complaint to allege the specific items and amounts of the damages when they become known."

(Paragraph numbering omitted.)

The Evenstads further alleged that Walsh had breached its construction contract in a number of specifics, including:

"(a)  Failing to mix and apply the stucco products and cladding system in a professional and workmanlike manner;

"(b)  Failing to mix and apply the stucco products and cladding system in accordance with industry standards;

"(c)  Failing to mix and apply the stucco products and cladding system according to the stucco manufacturer's instructions and recommendations;

"(d)  Failing to properly mix the lime plaster compounds to meet the appropriate density for the stucco;

"(e)  Failing to supply plaintiffs with a stucco product and cladding system that was free of defects and that met industry standards;

"(f)  Applying the cement plaster, lime plaster and/or limestone mortar that make up the stucco cladding during periods when the ambient temperature was greater than 77° F without follow-up moist-curing of the basecoat during the cure process;

"* * * * *

"(h)  Applying a stucco product that did not contain a proper mix of binder agents;

"(i)  Applying a stucco product that was represented to contain only lime-based materials, but that in fact contained non-lime based materials;

"(j)  Applying a defective stucco product and cladding system * * *."

In response to the complaint, Walsh filed its own third-party complaint against Shearer, its subcontractor, and TransMineral. Walsh alleged that Shearer "was responsible for all aspects of recommending, selecting, and applying stucco products to the Residence," and was therefore liable to Walsh on a theory of indemnity or contribution. As for TransMineral, Walsh alleged that the company was "in the business of distributing limestone products" and was negligent "in designing and manufacturing the stucco product used on the Residence * * *."

After receiving the third-party complaint, Shearer tendered the defense of the claims to Gemini, which, beginning in 2000, had insured TransMineral under a general liability policy. Shearer claimed that it, too, was covered by TransMineral's policy through what is known as a "vendors endorsement." The endorsement at issue (titled "Additional Insured—Vendors") provided coverage to "all vendors of [TransMineral]," but "only with respect to 'bodily injury' or 'property damage' arising out of 'your products' * * * which are distributed or sold in the regular course of the vendor's business," subject to certain exclusions.

Shearer, at all relevant times, had been operating under an "Exclusive Applicator Agreement" with TransMineral. The agreement provided that "TransMineral desires to grant to the Exclusive Applicator [Shearer] the exclusive right to distribute Lé Decor Products [stucco] and all the other products [TransMineral] distributes." Nonetheless, Gemini rejected Shearer's tender, on the ground that, "[i]f there is any fault in this matter, it will bear a relationship to the negligent 'mixing' of the product and/or the application thereof."[2]

Its tender rejected, Shearer filed this action against Gemini seeking a declaration that, under the vendors

---

[2] Gemini's claim representative first set out that position in November 2004, in response to an earlier tender from Shearer—one made before any claims had actually been filed against Shearer. The claim representative reiterated that position in response to the later tender as well.

endorsement, Gemini owed a duty to defend Shearer in the underlying litigation. Shearer then moved for partial summary judgment on that question, and the trial court granted the motion. Additional issues regarding the amount of the defense obligation were tried to the court, and the court again ruled in Shearer's favor. The rulings were reduced to a limited judgment, which Gemini now appeals. That judgment provides, in part:

> "1. Gemini owes a duty to defend Shearer in the Evenstad Residence Case, which duty accrued on November 4, 2004;
>
> "* * * * *
>
> "3. Gemini is responsible for fifty percent (50%) of Shearer's defense costs in * * * the Evenstad Residence [case] * * * from the date[ ] specified above;
>
> "* * * * *
>
> "5. Shearer's billed defense costs * * * were 'incurred' and are recoverable[.]"

In its first assignment of error, Gemini challenges the trial court's ruling on Shearer's motion for partial summary judgment regarding the duty to defend. The trial court erred in granting that motion, Gemini argues, for either of two reasons: One, Shearer is not an insured for purposes of the vendors endorsement to TransMineral's policy; and, two, even assuming that Shearer is an insured, certain exclusions in the policy eliminate any coverage that Shearer might otherwise have had.[3]

We begin with the question whether Shearer is an "insured" under TransMineral's policy. The vendors endorsement to that policy, as explained above, extends coverage to

---

[3] Although it assigns as error the grant of Shearer's motion for partial summary judgment, the relief Gemini seeks is a reversal and remand for entry of judgment dismissing Shearer's claims—presumably based on the understanding that the issues before us are purely legal. However, as we have previously explained, there is a difference between defeating an adverse motion for summary judgment, on the one hand, and prevailing on one's own summary judgment motion, on the other. Because Gemini did not assign error to the denial of its own motion, it would be entitled, at most, to a remand for further proceedings were it to prevail on this assignment of error.

"any person or organization (referred to below as vendor)" that distributes or sells TransMineral's products in the "regular course of [that person or organization's] business." 237 Or App at 472. For its part, Gemini does not appear to contest the fact that Shearer, pursuant to its Exclusive Applicator Agreement with TransMineral, was a "distributor" of TransMineral products, including the Lé Decor product used on the Evenstad residence. Rather, Gemini makes a more technical argument: that it is impossible to tell *from the pleadings in the underlying action or the policy language* that Shearer sold or distributed the stucco product in the ordinary course of business. In Gemini's view, the four corners of those documents—that is, the pleadings and the insurance policy— exclusively govern whether Gemini owes any duty to defend, and "[n]othing in [Walsh's] allegations expressly or impliedly connotes that Shearer 'distributed' or 'sold' the TransMineral products."[4] In light of that deficiency in the underlying pleadings, Gemini argues, the trial court erred in granting summary judgment in favor of Shearer.

Meanwhile, Shearer appears to accept Gemini's statement of the "four-corners rule" but argues that the pleadings do, in fact, demonstrate that Shearer was an "insured."[5] Shearer's concession regarding the scope of our review, however, is not well founded and for the reasons that follow, we choose not to accept it. *McLauchlan and McLauchlan*, 227 Or App 476, 491, 206 P3d 622, *rev den*, 346 Or 363 (2009) (where this court "do[es] not agree with the parties' understanding of the law," it is not bound to accept a concession regarding a legal conclusion) (citing *State v. Bea*, 318 Or 220, 224, 864 P2d 854 (1993)).

---

[4] Gemini further contends that an "insured" for purposes of the vendors endorsement includes only persons or organizations who sell over the counter or "off the rack," and does not include companies that, like Shearer, provide a product "incident to a service transaction." The text of the policy does not support that narrow interpretation.

[5] Shearer's brief is somewhat ambiguous on this point, offering an unenthusiastic defense of the trial court's admission of extrinsic evidence and then "assuming for the sake of argument" that the court may consider only the policy and the underlying complaints. At oral argument, Shearer expressly conceded that the inquiry regarding the duty to defend was limited to the facts in the underlying complaints, relying on extrinsic evidence only for purposes of "background."

The seminal case regarding the duty to defend under Oregon law is *Ledford v. Gutoski*, 319 Or 397, 877 P2d 80 (1994). In an oft-quoted passage, the court explained:

"Whether an insurer has a duty to defend an action against its insured depends on two documents: the complaint and the insurance policy. *Oakridge Comm. Ambulance v. U.S. Fidelity*, 278 Or 21, 24, 563 P2d 164 (1977). An insurer has a duty to defend an action against its insured if the claim against the insured stated in the complaint could, without amendment, impose liability for conduct covered by the policy. *Nielsen v. St. Paul Companies*, 283 Or 277, 280, 583 P2d 545 (1978); *Oakridge Comm. Ambulance v. U.S. Fidelity, supra*, 278 Or at 24; *Ferguson v. Birmingham Fire Ins.*, 254 Or 496, 507, 460 P2d 342 (1969).

"In evaluating whether an insurer has a duty to defend, *the court looks only at the facts alleged in the complaint to determine whether they provide a basis for recovery that could be covered by the policy*:

" 'If the facts alleged in the complaint against the insured do not fall within the coverage of the policy, the insurer should not have the obligation to defend. If a contrary rule were adopted, requiring the insurer to take note of facts other than those alleged, the insurer frequently would be required to speculate upon whether the facts alleged could be proved. We do not think this is a reasonable interpretation of the bargain to defend. It is more reasonable to assume that the parties bargained for the insurer's participation in the lawsuit only if the action brought by the third party, if successful, would impose liability upon the insurer to indemnify the insured.' *Isenhart v. General Casualty Co.*, 233 Or 49, 54, 377 P2d 26 (1962).

"An insurer should be able to determine *from the face of the complaint* whether to accept or reject the tender of the defense of the action. *Ferguson v. Birmingham Fire Ins., supra*, 254 Or at 505-06."

*Ledford*, 319 Or at 399-400 (emphasis added).

Certain parts of that passage, read in isolation, support Gemini's contention that the duty to defend is determined solely by facts alleged in the underlying complaint. However, it is important to understand what was at issue in

*Ledford*—and what was not. The question in *Ledford* was whether the complaint could "impose liability for *conduct* covered by the policy." 319 Or at 400 (emphasis added). The court was not concerned with the preliminary question: whether the party seeking coverage was actually an *insured* within the meaning of the policy. Rather, *Ledford*—and, to our knowledge, every other case in which Oregon appellate courts have held that their inquiry was limited to the facts of the underlying complaint—presumed the existence of an "insured" within the meaning of the policy. *See, e.g., Nielsen,* 283 Or at 280; *Oakridge Comm. Ambulance,* 278 Or at 24; *Ferguson,* 254 Or at 507; *Isenhart,* 233 Or at 54.[6]

Gemini (and Shearer, by way of concession) would have us apply the same four-corners rule to both inquiries, looking exclusively to the facts of the underlying complaint to determine (1) whether Shearer was an "insured" within the meaning of the policy and (2) if so, whether the alleged conduct falls within the scope of the coverage. But those inquiries, in our view, are analytically distinct,[7] and the four-corners rule is not easily justified in the case of the former.

When the question is whether the insured is being held liable for conduct that falls within the scope of a policy, it makes sense to look exclusively to the underlying complaint. That complaint sets the boundaries of the insured's liability, and, as the court reasoned in *Isenhart,* "[i]f a contrary rule were adopted, requiring the insurer to take note of facts other than those alleged, the insurer frequently would be required to speculate upon whether the facts alleged could be proved." 233 Or at 54.

---

[6] In *Winther v. Valley Ins. Co.,* 140 Or App 459, 915 P2d 1050 (1996), we looked exclusively to the facts in the complaint where a partner claimed that she was an insured under her partnership's insurance policy. In that case, the real issue was whether the alleged "conduct" was covered under the language of the terms of the policy, which covered personal injuries "[a]rising out of the conduct of your business[.]" *Id.* at 461. There may be cases in which the question of an "insured" is inextricably intertwined with the relevant "conduct" under the policy; this is not such a case.

[7] The Supreme Court has treated the inquiries separately. *See, e.g., Holloway v. Republic Indemnity Co. of America,* 341 Or 642, 649, 147 P3d 329 (2006) ("[O]ur analysis begins, and ends, with our decision respecting whether the purported assignment from the insured to [the plaintiff] was valid. Because we hold that it was not, we need not decide the issue respecting the allegations [against the insured].").

The same cannot be said with respect to whether a party seeking coverage is an "insured." The facts relevant to an insured's relationship with its insurer may or may not be relevant to the merits of the plaintiff's case in the underlying litigation. The plaintiff in the underlying case is required to plead facts that establish the defendant's liability; the plaintiff often is not required to establish the nature of the defendant's relationship to some other party or to an insurance company in order to prove a claim. In this case, for example, the Evenstads had no reason to allege that Shearer sold or distributed TransMineral's products in the ordinary course of its business; nor did Walsh need to allege that fact in order to make out its third-party claim against Shearer.

■       For that reason, we do not see the logic in requiring Shearer to demonstrate that the underlying complaints establish the relationship between TransMineral and Shearer, or, consequently, that Shearer is Gemini's "insured" within the meaning of the policy. *Accord Northfield Ins. Co. v. Loving Home Care, Inc.*, 363 F3d 523, 531 (5th Cir 2004) (recognizing an exception to the general rule barring extrinsic evidence "when it is initially impossible to discern whether coverage is potentially implicated and when the extrinsic evidence goes solely to a fundamental issue of coverage which does not overlap with the merits of or engage the truth or falsity of any facts alleged in the underlying case") (emphasis omitted); *Burd v. Sussex Mutual Insurance Company*, 56 NJ 383, 388, 267 A2d 7 (1970) ("[W]hen coverage * * * depends upon a factual issue which will not be resolved by the trial of the third party's suit against the insured, the duty to defend may depend upon the actual facts and not upon the allegations in the complaint. So, for example, if a policy covered a Ford but not a Chevrolet also owned by the insured, * * * [t]he identity of the car, upon which coverage depends, would be irrelevant to the trial of the negligence action.").[8]

---

[8] *See also* Allan D. Windt, *Insurance Claims and Disputes* § 4.5, 4-97 (5th ed 2007) ("Before the general principle regarding the duty to defend applies [barring consideration of facts outside the complaint], it must be shown that the person claiming coverage is, in fact, an insured."); Barry R. Ostrager and Thomas R. Newman, *Handbook on Insurance Coverage Disputes* § 5.02[b], at 147 (6th ed 1993) ("[W]here the duty to indemnify cannot be resolved by trial of a third-party's action against the insured, the duty to defend may depend upon actual facts and not upon the allegations of the complaint.").

Accordingly, we reject Gemini's argument that the trial court erred in entering judgment because the underlying pleadings did not affirmatively demonstrate that Shearer was an insured for purposes of the vendors endorsement.[9]

■ We turn, then, to Gemini's alternative contention that certain policy exclusions operate to defeat coverage, thereby eliminating its duty to defend. Gemini first contends that the policy excludes coverage for "work product"—that is, damage to the stucco itself. According to Gemini, the Evenstads alleged only that *the stucco* on their home cracked and leaked; they did not allege, as the policy requires, some damage to their home "beyond the cost of replacing the faulty stucco." Shearer responds, once again, that Gemini reads the underlying complaint too narrowly.

■ On this issue, the parties have correctly identified our scope of review. In determining whether a policy exclusion applies to the conduct at issue, we look "only at the facts alleged in the complaint to determine whether they provide a basis for recovery that could be covered by the policy." *Ledford*, 319 Or at 400. If the allegations in the complaint are ambiguous, but a reasonable interpretation would bring them within coverage, there is a duty to defend. *Klamath Pacific Corp. v. Reliance Ins. Co.*, 151 Or App 405, 413, 950 P2d 909 (1997), *modified on recons*, 152 Or App 738, 955 P2d 340 (1998); *see also Nielsen*, 283 Or at 280 ("The insurer owes a duty to defend if the claimant can recover against the insured under the allegations of the complaint *upon any basis* for which the insurer affords coverage." (Emphasis in original.)). Moreover, if some allegations reasonably can be interpreted as falling within the coverage, the insurer owes a duty to defend—even if other allegations of conduct or damage are excluded. *Abrams v. General Star Indemnity Co.*, 335 Or 392, 399-400, 67 P3d 931 (2003) ("[W]hen the complaint contains allegations of conduct that are excluded under the insurance policy * * * the court must determine whether the

---

[9] Again, we do not understand Gemini to argue that there were disputed issues of fact as to whether Shearer sold or distributed stucco products in the ordinary course of its business. Rather, we understand Gemini to argue that Shearer was required to prove that the underlying complaints established those facts, as opposed to some other evidence (for example, the Exclusive Applicator agreement by which Shearer contracted to distribute TransMineral's limestone products).

complaint contains allegations of *covered* conduct. If it does * * *, then the insurer has a duty to defend, even if the complaint also includes allegations of excluded conduct." (Emphasis in original.)).

In their complaint against Walsh, the Evenstads alleged that, "[a]fter the repairs were completed, [they] began to notice cracking of the stucco * * *." They further alleged that they "became more concerned as the cracking continued and they began to notice leaking and mold[.]" As for the cost of the repairs, the Evenstads alleged that, although they had not yet obtained bids, "their preliminary estimate is that the total costs of the design and repair work will be approximately $1.5 million." In its third-party complaint, Walsh sought to pass that same liability along to Shearer.

The Evenstads' complaint clearly alleges cracking of the stucco itself. The complaint is ambiguous, however, as to whether damages from "leaking and mold" pertain *only* to the stucco, or rather to other parts of the house. The allegations reasonably can be read to refer to the latter—*i.e.*, damage to the house beneath the stucco siding, as a result of "leaking and mold." And because a reasonable reading of the complaint would bring some of the allegations within the coverage of the policy, it is irrelevant—at least for purposes of the duty to defend—that other allegations might be excluded. *Abrams*, 335 Or at 399-400.

Gemini next relies on two policy exclusions specific to the vendors endorsement. The first states that "the insurance afforded the vendor does not apply to * * * [a]ny physical or chemical change in the product made intentionally by the vendor[.]" The second states that the coverage does not apply to "[p]roducts which, after distribution or sale by you, have been labeled or relabeled or used as a container, part or ingredient of any other thing or substance by or for the vendor." According to Gemini, by mixing TransMineral's products with water and then installing them on the house, Shearer "necessarily changed the physical composition of the TransMineral stucco products" and "fabricated on-site a product that was separate and distinct from its constituent parts."

■■■■ The meaning of a policy exclusion is a question of law. *Hoffman Construction Co. v. Fred S. James & Co.*, 313 Or 464, 469, 836 P2d 703 (1992) (interpretation of an insurance policy is a question of law). In interpreting the terms of a policy, our goal is to ascertain the intention of the parties. *Holloway v. Republic Indemnity Co. of America*, 341 Or 642, 649, 147 P3d 329 (2006). We begin with the wording of the policy, applying any definitions contained in the policy and otherwise giving words their plain, ordinary meanings. *Hoffman Construction Co.*, 313 Or at 469-70. If that examination yields only one plausible interpretation of the disputed terms, our analysis goes no further. However, if we determine that the disputed term is susceptible to more than one plausible interpretation, we examine the term in the broader context of the policy as a whole. *Id.* at 470. If the policy's broader context fails to resolve the ambiguity, we will then construe the policy against the drafter, in this case, Gemini. *Id.* at 470-71.

We begin, then, with the language of the exclusions. The vendors endorsement provides:

"WHO IS AN INSURED (Section II) is amended to include as an insured any [vendor], but only with respect to 'bodily injury' or 'property damage' arising out of 'your products' * * * which are distributed or sold in the regular course of the vendor's business, subject to the following additional exclusions:

"1.   The insurance afforded the vendor does not apply to:

"a.   'Bodily injury' or 'property damage' for which the vendor is obligated to pay damages by reason of the assumption of liability in a contract or agreement. * * *;

"b.   Any express warranty unauthorized by you;

"c.   *Any physical or chemical change in the product made intentionally by the vendor*;

"d.   Repackaging, unless unpacked solely for the purpose of inspection, demonstration, testing, or the substitution of parts under instructions from the manufacturer, and then repackaged in the original container;

"e.   Any failure to make such inspections, adjustments, tests or servicing as the vendor has agreed to make or normally undertakes to make in the usual course of business, in connection with the distribution or sale of the products;

"f.   Demonstration, installation, servicing or repair operations, except such operations performed at the vendor's premises in connection with the sale of the product;

"g.   *Products which after distribution or sale by you, have been labeled or relabeled or used as a container, part or ingredient of any other thing or substance by or for the vendor.*"

(Emphasis added.)

Gemini takes the position that, under the exclusions listed in paragraphs c. and g., the mere fact of mixing TransMineral's product or installing it as part of a stucco cladding system is sufficient to trigger the exclusion. That is, Gemini argues that, regardless of where the alleged defect was introduced into the product—before or after Shearer's mixing and installation—the exclusions are triggered once a vendor mixes and installs the product as a "component part of something else." So, as Gemini reads the policy, the vendors endorsement essentially provides coverage to vendors who do nothing more than resell the product just as they receive it—for example, the insurance would apply "[i]f Shearer had been sued by someone who purchased a bag of stucco and was injured by inhaling stucco dust," or if property owners were to purchase bags of stucco from Shearer and then mix and apply them on their own. Shearer, in response, contends that "[t]he mere fact that a product is mixed, or incorporated into another product or a building, does not determine the question of insurance coverage *when the product is defective from the outset*." (Emphasis added.)

Neither the exclusions in dispute nor the issue before us in this case is uncommon. A number of courts in other jurisdictions have previously considered when and how these same exclusions in a vendors endorsement apply, and more specifically, whether the exclusions require some nexus between the vendor's conduct and the damages alleged. *See, e.g., Weaver v. CCA Industries, Inc.*, 529 F3d 335 (5th Cir 2008); *Hartford Fire Ins. Co. v. St. Paul Surplus Lines Ins.*

*Co.*, 280 F3d 744 (7th Cir 2002); *Dometic Corp. v. Liberty Mut. Ins. Co.*, 2008 WL 4443234 (SD Ind 2008); *Shade Foods, Inc. v. Innovative Product Sales & Marketing, Inc.*, 154 Cal App 4th 1184, 93 Cal Rptr 2d 364 (2000); *Travelers Ins. Co. v. Freightliner Corp.*, 256 Ill App 3d 1049, 628 NE 2d 325 (1993). That body of law, though not strictly following Oregon's method of policy interpretation, buttresses our own observation regarding the text of the exclusions in paragraphs c. and g.: They are ambiguous as to whether it matters how the damages arose.

Paragraph c., set out above, states that the "insurance afforded the vendor does not apply to * * * [a]ny physical or chemical change in the product made intentionally by the vendor[.]" It could be, as Gemini contends, that the parties meant for that exclusion to eliminate coverage once the product has been changed, regardless of whether bodily injury or property damage arose out of the "changed" product or from some defect that was present from the outset. But that is not literally what the text says. The direct object of the sentence—*i.e.*, that to which the "insurance afforded the vendor does not apply"—is the product "change" itself. Given that sentence structure, it is also plausible to read the exclusion as eliminating coverage only with respect to the physical or chemical change to the product, which would preserve coverage for property damage or liability that arose otherwise, *i.e.*, from a defect independent of the change.

Paragraph g. is similarly ambiguous. It states that the vendor's insurance does not apply to "[p]roducts which after distribution or sale by you, have been labeled or relabeled or used as a container, part or ingredient of any other thing or substance by or for the vendor." It could be that the exclusion is triggered once the product has been "labeled or relabeled or used as a container, part or ingredient," regardless of whether those activities actually contributed to the bodily injury or property damage. In other words, once the product has been labeled, relabeled, or used as a container, part, or ingredient, coverage is lost no matter the source of the bodily injury or property damage. Or, it could be that the exclusion was intended to eliminate coverage only for the labeled, relabeled, or used product itself; that is, it only excludes coverage if the claims actually *arise out of* the

labeling, relabeling, or use of the product as a container, part, or ingredient.

Nothing in the broader context of the vendors endorsement, or the policy as a whole, eliminates the ambiguity in those exclusions. The policy states that Gemini will "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." It further provides that Gemini "will have the right and duty to defend the insured against any 'suit' seeking those damages." The vendors endorsement likewise is clear as to the nature of the "insurance afforded the vendor": coverage for " 'bodily injury' or 'property damage' *arising out of* 'your products[.]' " (Emphasis added.)

Given that the policy frames the "insurance afforded the vendor" in terms of whether "bodily injury" or "property damage" has arisen out of the product, a reasonable purchaser of insurance might well expect the *exclusions* to that insurance to similarly relate to how bodily injury or property damage has arisen. At the same time, the fact that the policy elsewhere imposes an "arising out of" requirement, but does not do so in the exclusions, supports Gemini's interpretation.[10]

Because we are unable to resolve the ambiguity based on the text and context of the policy, we therefore will interpret the provision against the insurance company and in favor of coverage. *North Pacific Ins. Co. v. Hamilton*, 332 Or 20, 25, 22 P3d 739 (2001). Applying that maxim, we interpret the exclusions in paragraphs c. and g. of the vendors endorsement to require some nexus between the vendor's conduct as described in the exclusion and the alleged "bodily injury" or "property damage." Thus, for the exclusion under paragraph

---

[10] In *Dometic Corp.*, the court explained that "the typical broad form vendors endorsement went through language changes leading to the exclusion language at issue in this case." 2008 WL 4443234 at *7. Those changes, according to the court, eliminated the "arising out of" language from the vendors endorsement that, in earlier cases, had been held to require some nexus between the injuries at issue and the conduct listed in the exclusion. Insurance companies may well have changed the language of the endorsement in an effort to avoid the result of those earlier cases, but the revised language is too ambiguous to alert a reasonable purchaser of insurance of that intent.

c. to apply, Gemini must demonstrate that the property damage to the Evenstad residence arose out of a "physical or chemical change in the product made intentionally by [Shearer]"; likewise, for the exclusion under paragraph g. to apply, Gemini must demonstrate that the property damage to the Evenstad residence arose out of the fact that the product had been "labeled or relabeled or used as a container, part or ingredient[.]"[11]

With that understanding of the policy language, we turn back to the allegations in the Evenstads' complaint and Walsh's third-party complaint. The Evenstads' complaint alleged a number of specific ways in which Walsh breached the construction contract and/or was negligent. Among them were (1) "Failing to supply plaintiffs with a stucco product and cladding system that was free of defects and that met industry standards"; (2) "Applying a stucco product that was represented to contain only lime-based materials, but that in fact contained non-lime based materials"; and (3) "Applying a defective stucco product and cladding system." Walsh, in turn, alleged in its third-party complaint that TransMineral was negligent "in designing and manufacturing the stucco product used on the Residence" and that Shearer was "responsible for all aspects of recommending, selecting, and applying stucco products to the Residence."

Read together, the allegations in the complaint and third-party complaint make out a claim against Shearer for, among other things, recommending and supplying a stucco product to the Evenstads that was defective when designed and manufactured by TransMineral. The exclusions in paragraphs c. and g. of the vendors endorsement do not exclude

---

[11] Our reading of the policies is consistent with the majority rule described in Lee R. Russ and Thomas F. Segalla, 9A *Couch on Insurance* 3d, § 130:10 (2008):

"Such exclusions [in a vendors endorsement] are interpreted narrowly; for the exclusion upon subsequent changes to apply, there must, in fact, be subsequent changes, and whatever the description of the change that triggers the exclusion, the injury or damage complained of *must arise out of that subsequent change to the product.*

"If the exclusion is written to apply once the insured's product has been relabeled, for example, *injury must arise out of the relabeling or out of the use of the insured's product as part of another product in order for coverage to be excluded.*"

(Emphasis added; footnotes omitted.)

coverage for that conduct. Therefore, Gemini owed a duty to defend Shearer against the claim, even if other theories of recovery against Shearer would be excluded under the policy. *Abrams*, 335 Or at 399-400. And for that reason, and the others stated above, we reject Gemini's first assignment of error.

■ Gemini next assigns error to the trial court's denial of its motion to strike certain exhibits filed in support of Shearer's motion for partial summary judgment. That argument hinges on the theory that the court's scope of review was limited to the pleadings and the policy, and that extrinsic evidence was not relevant to the issues before the court. For the reasons previously discussed, Gemini's premise is incorrect; the inquiry as to whether Shearer was an insured under the policy was not limited to the pleadings and the text of the policy. 237 Or App at 477. But even assuming that some of the exhibits should have been excluded, Gemini has not demonstrated that it was prejudiced by their admission. In fact, Gemini concedes that such error "does not require reversal," because "this court can proceed to evaluate whether Gemini owed a duty to defend, ignoring the improperly admitted evidence." Because it does not provide a basis for reversing the judgment, we reject Gemini's second assignment of error without further discussion.

■ Gemini's remaining assignments of error pertain to the trial court's calculation and allocation of defense costs. In its third assignment, Gemini argues that the trial court erred in concluding that Gemini owed half of Shearer's defense costs for each year, even though three separate insurers had an obligation to defend Shearer. The correct allocation, according to Gemini, would have been one-third because each insurance policy contained an "other insurance" clause that limited coverage to an equal share of the obligation.

The trial court allocated the funds after a trial on stipulated facts. In its ruling, the court explained:

"A number of insurers were involved over the years in insuring TransMineral and its vendor, [Shearer]. The relationships between the insurers were somewhat complicated. The various companies owned, bought or sold one

another, and at various times were the predecessor or successor of another. *At all times, including when defendant was involved, there were a total of two insurers.*

"All of the relevant policies have similar other insurance clause language. For the purpose of calculating [Gemini's] share, [Shearer's] other insurers are treated, relative to defendant, as one entity. * * *

*"The net result is that [Gemini], at any given time, and at all times relevant here, is effectively a co-primary insurer. Accordingly, [Gemini] shares an equal obligation for defense costs, i.e. fifty percent."*

(Emphasis added.)

In light of the stipulated facts in this case, we are not persuaded that the trial court erred in its allocation of defense costs. The parties stipulated as follows:

"OneBeacon Insurance Company is legally liable for all losses that occur on North Pacific Insurance Company policies issued prior to November 1, 2001. Both North Pacific and Oregon Automobile Insurance Company are under Liberty Northwest ownership and Liberty Northwest is legally liable for all losses that occur on policies issued after November 1, 2001.

"By mutual agreement, OneBeacon Insurance Company and North Pacific Insurance Company are both contributing to the defense of plaintiff in the [Evenstad action], pursuant to the defense obligation arising out of the insurance policies [described in the stipulation] and the allocation of legal liability described [in the preceding paragraph]. North Pacific's contribution to plaintiff's defense is on behalf of Liberty Northwest."

Under that stipulation, *either* OneBeacon Insurance Company *or* Liberty Northwest is liable to Shearer for policy periods, but not both. Gemini's defense obligation, meanwhile, spanned 2000 through 2004. So, as the trial court explained, at all relevant times, there were only two insurers on the risk (with North Pacific agreeing to pay Liberty Northwest's defense obligation). Under those circumstances, the trial court did not err in treating Gemini as one of two co-primary insurers.

In its final assignment, Gemini argues that the trial court erred in awarding defense costs to Shearer for expenses that Shearer's other insurers, OneBeacon and North Pacific, had refused to pay. According to Gemini, OneBeacon and North Pacific are the real parties in interest in this case (pursuant to a stipulation by Shearer) and should not, in equity, be permitted to prosecute claims through Shearer for costs that they themselves had refused to pay. In effect, Gemini argues that this case should be treated as a claim for equitable contribution among insurers rather than a claim for breach of the duty to defend. However, that is not how the case was pleaded, and the parties' stipulation regarding real parties in interest has not converted Shearer's legal claim into an equitable contribution claim. We are not persuaded that the trial court erred by including, as part of Gemini's obligation, defense costs that were incurred by counsel in the underlying action, even if Shearer's other insurers have refused to pay them.

Affirmed.