Argued and submitted September 11, 2015, reversed and remanded
May 10, 2017

HUNTERS RIDGE
CONDOMINIUM ASSOCIATION,
*Plaintiff-Appellant,*

*v.*

SHERWOOD CROSSING, LLC;
and White Construction Co., LLC,
*Defendants,*

*and*

AMERICAN FAMILY MUTUAL
INSURANCE COMPANY,
*Garnishee-Respondent.*

Washington County Circuit Court
C091304CV; A157014 (Control)

HUNTERS RIDGE
CONDOMINIUM ASSOCIATION,
as Assignee of E.A. White Construction Co., LLC,
*Plaintiff-Appellant,*

*v.*

WALTER GEORGE CONSTRUCTION, INC.,
*Defendant,*

*and*

AMERICAN FAMILY MUTUAL
INSURANCE COMPANY,
*Garnishee-Respondent.*

Washington County Circuit Court
C115276CV; A157016

395 P3d 892

Anthony L. Rafel argued the cause for appellant. With him on the briefs was Rafel Law Group PLLC.

Todd S. Baran argued the cause for respondent. With him on the briefs was Todd S. Baran, PC.

Before Ortega, Presiding Judge, and Lagesen, Judge, and Garrett, Judge.

## GARRETT, J.

This appeal arises from a garnishment proceeding which, itself, arose from a construction-defect dispute concerning Hunters Ridge, a condominium development. Plaintiff, the condominium association, brought claims against the developer and general contractor. The developer filed a third-party complaint against various subcontractors, including Walter George Construction (WGC). WGC failed to appear, resulting in the entry of default judgments against it. Plaintiff then instituted garnishment proceedings against garnishee American Family Mutual Insurance Company (AFM), WGC's insurer, to recover the amounts awarded by the default judgments. In the garnishment proceeding, both parties filed summary judgment motions; on appeal, both parties assign error to the trial court's disposition of those motions.

First, plaintiff assigns error to the trial court's grant of summary judgment to AFM. The trial court concluded that AFM's policy does not provide coverage for the default judgments because WGC's work on the condominium project— a mixed-use development with commercial office and retail space on the ground floors and residential units on the upper floors—fell within the policy exclusion for "Multi-Unit New Residential Construction." On appeal, plaintiff argues that the language of the exclusion is ambiguous, that the ambiguity must be resolved against AFM as the drafter, and that the policy exclusion, correctly interpreted, does not preclude coverage. For the reasons explained below, we agree that the trial court erred in granting summary judgment to AFM, and we reverse.

Plaintiff also assigns error to the trial court's denial of its motion for summary judgment, arguing that the undisputed facts show that AFM is liable for the entire sum garnished. In response, AFM relies, as it did below, on the existence of various policy exclusions (other than the "Multi-Unit New Residential Construction" exclusion). We conclude that AFM met its burden to show disputed questions of material fact as to the application of those policy exclusions. Accordingly, the trial court did not err in denying plaintiff's motion for summary judgment.

Below, AFM moved in the alternative for partial summary judgment on the ground that the writs of garnishment improperly included attorney fees and costs awarded in the default judgments—items that, according to AFM, are not covered by its policy. The trial court denied that motion, concluding that the attorney fees and other expenses are covered by the policy. AFM cross-assigns error to that ruling. We conclude that the trial court did not err in denying AFM's alternative motion because attorney fees and other litigation expenses are covered by the policy either as "damages" or "costs taxed against the insured."

Finally, AFM assigns error to the trial court's denial of its motion to conduct a jury trial on the garnishment case, arguing that it had a right to a jury trial on disputed questions of fact. As a preliminary matter, we conclude that the legislature intended that garnishment proceedings conducted under ORS 18.782 be tried without a jury. Having so concluded, we agree with AFM that, to the extent that ORS 18.782 requires parties in an insurance-coverage dispute to litigate factual questions to the court in a garnishment proceeding, the statute is inconsistent with Article I, section 17, of the Oregon Constitution.

## STANDARD OF REVIEW

When parties appeal from a judgment involving cross-motions for summary judgment, and the parties assign error to the trial court's rulings on both motions, both rulings are subject to appellate review. *Mid-Valley Resources v. Foxglove Properties*, 280 Or App 784, 789, 381 P3d 910 (2016). In reviewing cross-motions for summary judgment, we view the record "in the light most favorable to the party opposing [each motion] to determine whether there is a genuine issue of material fact and, if not, whether the moving party is entitled to judgment as a matter of law." *Id.* (internal quotation marks omitted).

## POLICY EXCLUSION FOR "MULTI-UNIT NEW RESIDENTIAL CONSTRUCTION"

Because the underlying facts are complicated, we organize them according to the different issues presented by the parties' respective assignments of error. The first issue

that we address is the language of the policy exclusion for "Multi-Unit New Residential Construction." As noted, the trial court concluded that that language is unambiguous and excludes coverage for the work performed by WGC. The court granted summary judgment for AFM on that basis. Plaintiff assigns error to that ruling.

The facts relevant to this assignment of error are undisputed. The Hunters Ridge condominium development was built in 2005 and 2006. The complex consists of three buildings (A, B, and C), each of which contains dedicated commercial office and retail space on the ground floor and residential units on the upper floors. The condominium declaration specifies that each commercial unit "shall be used for commercial office and retail uses only."

The developer, Sherwood Crossing, LLC ("Sherwood"), hired E.A. White Construction Co., LLC ("White") as general contractor. White then hired WGC as a subcontractor to install siding and weatherproofing on Buildings B and C. Building B consists of 25 residential units and three commercial units, and Building C consists of 20 residential units and five commercial units.

In early 2009, plaintiff asserted construction-defect claims against Sherwood and White. Sherwood then named WGC and other subcontractors as third-party defendants. WGC tendered its defense to AFM, which had issued commercial liability insurance policies to WGC. AFM denied any obligation to defend WGC in the lawsuit, citing the following policy exclusion:

"Exclusion - Multi-Unit New Residential Construction (Greater Than Eight Units)

"* * * * *

"This insurance does not apply to 'bodily injury' or 'property damage' arising out of:

"1. 'Your work' in connection with pre-construction, construction, post-construction of any 'multi-unit residential building'; or

"2. Any of 'your products' which will or have become a part of the real property of any 'multi-unit residential building.'

"*****

"The following is added to Section V. Definitions, 'Multi-Unit Residential Building' means a condominium, townhouse, apartment or similar structure, each of which has greater than eight units built or used for the purpose of residential occupancy."

After WGC failed to answer or otherwise appear in the lawsuit, the trial court entered an order of default against it. As a result of a settlement agreement and assignments of rights among various parties, plaintiff ultimately obtained two default judgments against WGC. (Those procedural facts are not relevant to this assignment of error, but we address them further below with respect to other assignments of error.)

Plaintiff then issued writs of garnishment against AFM, WGC's insurer, to recover the amounts owed in the two judgments. *See* ORS 18.352.[1] The trial court held a hearing to resolve the issue of AFM's liability under ORS 18.778(1) (providing that a court may order a garnishee to appear for a hearing to determine the garnishee's liability). The parties filed cross-motions for summary judgment; the trial court granted AFM's motion and denied plaintiff's motion, concluding that AFM was not liable for any damages caused by WGC because the "Multi-Unit New Residential Construction" exclusion "unambiguously excludes coverage."

On appeal, plaintiff assigns error to the trial court's grant of summary judgment to AFM, arguing that the "Multi-Unit New Residential Construction" exclusion is ambiguous as to whether it applies to buildings that contain both residential and commercial units. Given that ambiguity, plaintiff asserts that the exclusion must be construed against AFM as the drafter, and in favor of coverage. According to plaintiff, when the exclusion is so construed, it

---

[1] ORS 18.352 provides:

"Whenever a judgment debtor has a policy of insurance covering liability, or indemnity for any injury or damage to person or property, which injury or damage constituted the cause of action in which the judgment was rendered, the amount covered by the policy of insurance shall be subject to attachment upon the execution issued upon the judgment."

does not apply to Buildings B and C because those buildings are not exclusively residential structures.

The interpretation of an insurance policy is an issue of law. *Hoffman Construction Co. v. Fred S. James & Co.*, 313 Or 464, 469, 836 P2d 703 (1992). The overriding goal in construing an insurance policy is to "ascertain the intention of the parties." *Dewsnup v. Farmers Ins. Co.*, 349 Or 33, 39-40, 239 P3d 493 (2010) (internal quotation marks omitted). We determine the intention of the parties by analyzing the policy's express terms and conditions. *Hoffman*, 313 Or at 469; ORS 742.016(1) (providing that, with some exceptions, "every contract of insurance shall be construed according to the terms and conditions of the policy"); *see also Leach v. Scottsdale Indemnity Co.*, 261 Or App 234, 245, 323 P3d 337, *rev den*, 356 Or 400 (2014) ("[T]he interpretation of an insurance policy is a question of law that is confined to the four corners of the policy without regard to extrinsic evidence." (Internal quotation marks omitted.)). We "interpret the terms of an insurance policy according to what we perceive to be the understanding of the ordinary purchaser of insurance." *Congdon v. Berg*, 256 Or App 73, 87, 299 P3d 588 (2013) (quoting *Totten v. New York Life Ins. Co.*, 298 Or 765, 771, 696 P2d 1082 (1985)); *see also* ORS 42.250 ("The terms of a writing are presumed to have been used in their primary and general acceptation[.]").

If an insurance policy provides a definition for a term, we must apply that definition. *Holloway v. Republic Indemnity Co. of America*, 341 Or 642, 650, 147 P3d 329 (2006); *see also Andres v. American Standard Ins. Co.*, 205 Or App 419, 423, 134 P3d 1061 (2006) ("The text of the policy includes any definitions of disputed terms included in the policy; we must, in fact, construe the policy in accordance with any such definitions."). When, on the other hand, a particular word or phrase is not defined in a policy, we first look to whether the word or phrase has a plain meaning—*i.e.*, the word or phrase "'is susceptible to only one plausible interpretation.'" *Holloway*, 341 Or at 650 (quoting *Groshong v. Mutual of Enumclaw Ins. Co.*, 329 Or 303, 308, 985 P2d 1284 (1999)). If the word or phrase has more than one plausible interpretation, we then "examine the phrase in light of the particular context in which [it] is used in the policy and the

broader context of the policy as a whole." *Holloway*, 341 Or at 650 (internal quotation marks and brackets omitted). If, after examining the word or phrase in that context, the ambiguity persists—*i.e.*, two or more plausible interpretations remain— "any reasonable doubt as to the intended meaning of such a term will be resolved against the insurance company." *Id.* (internal quotation marks and brackets omitted).

Thus, to resolve whether the trial court properly granted summary judgment to AFM, we must decide whether the definition of "Multi-Unit Residential Building" is susceptible to multiple, plausible interpretations. The construction advanced by AFM is that the term "Multi-Unit Residential Building" includes any condominium structure with more than eight residential units, regardless of whether the structure also contains nonresidential units. We agree that that construction is plausible. Our task is to determine whether it is also plausible that the parties intended the term "Multi-Unit Residential Building" to mean an exclusively residential structure with more than eight units built or used for residential occupancy. If that construction remains plausible after examining the text of the policy definition in context, the exclusion is ambiguous and must be construed against the drafter, AFM.

The exclusion defines "Multi-Unit Residential Building" to mean "a condominium, townhouse, apartment or similar structure, each of which has greater than eight units built or used for the purpose of residential occupancy." According to plaintiff, an ordinary purchaser of insurance would not interpret the exclusion to apply to work performed on a mixed-use building because the exclusion, by its terms, applies to multi-unit *residential* buildings. Plaintiff reasons that the shared characteristic of a "townhouse" and an "apartment" is the fact that they are residential buildings, and, therefore, the term "condominium" as used in the exclusion could plausibly refer only to residential condominium buildings, as opposed to commercial or mixed-use condominium buildings. In response, AFM argues that the policy unambiguously applies to Buildings B and C because they are "condominiums"—*i.e.*, under a condominium form of ownership—and they each contain more than eight residential units.

Because "Multi-Unit Residential Building" is expressly defined in the policy, we must apply that definition. *Holloway*, 341 Or at 650. If that definition has a "plain meaning, we will apply that meaning and conduct no further analysis." *Id.* Because the individual terms used in the definition are not separately defined in the policy, we look to dictionary definitions of individual terms to determine whether the definition of "Multi-Unit Residential Building" as a whole has a plain meaning. *See Ortiz v. State Farm Fire and Casualty Co.*, 244 Or App 355, 360, 260 P3d 678 (2011) (looking to dictionary definitions, "the usual source of ordinary meaning," to determine whether the relevant terms have a "plain meaning").

After reviewing relevant dictionary definitions, we conclude that the definition of "Multi-Unit Residential Building" is susceptible to multiple, plausible interpretations, and, therefore, lacks a plain meaning. First, the word "condominium" can mean a multi-unit structure consisting of individually owned units of any kind, but it can also refer to a multi-unit *residential* structure. *See Webster's Third New Int'l Dictionary* 473 (unabridged ed 2002) (defining "condominium" in relevant part to mean "individual ownership of a unit in a multi-unit structure (as an *apartment building*)," "a unit so owned," or "a building containing condominiums" (emphasis added)); *Webster's* at 98 (defining "apartment building" to mean "a building containing a number of separate residential units and usu[ally] having conveniences (as heat and elevators) in common"); *Black's Law Dictionary* 358 (10th ed 2014) (defining "condominium" in relevant part to mean a "single real-estate unit in a multi-unit development in which a person has both separate ownership of a unit and a common interest, along with the development's other owners, in the common areas"). Second, the terms "apartment" and "townhouse," when used to refer to structures, ordinarily refer to multi-unit structures containing individual dwelling units. *See Webster's* at 137 (defining "town house" to mean "a single-family house of two or sometimes three stories connected to another house by a common sidewall"); *Webster's* at 98 (defining "apartment" in relevant part to mean "a room or set of rooms used as a dwelling and located in a private house, a hotel, or a building only containing such rooms or

suites with necessary passages and hallways," or "a building made up of individual dwelling units"). None of those definitions expressly includes mixed-use structures, although one of the meanings of "condominium" is broad enough to include such structures. Accordingly, an ordinary purchaser of insurance could reasonably conclude that each of the listed structures refers to an exclusively residential structure. For that reason, the relevant dictionary definitions of the listed structures do not render plaintiff's construction of the exclusion implausible.[2]

Having concluded that the policy definition lacks a plain meaning with respect to the types of structures subject to the exclusion, we must determine whether plaintiff's construction remains plausible when examined in context. *See Holloway*, 341 Or at 650. As noted above, the term "condominium" can refer either to an exclusively residential multi-unit structure or to a multi-unit structure containing any type of individual units. Given these alternatives, it is significant that the other listed structures in the policy definition—"apartment" and "townhouse"—are ordinarily understood to be *residential* in character. That fact sheds considerable light on how a purchaser of insurance would interpret the term "condominium" when included alongside those terms. *See Johnson v. Gibson*, 358 Or 624, 629-30, 369 P3d 1151 (2016) (under the interpretive canon *noscitur a sociis*, "the meaning of an unclear word may be clarified by the meaning of other words used in the same context"); *ZRZ Realty v. Beneficial Fire and Casualty Ins.*, 222 Or App 453, 490, 194 P3d 167 (2008), *adh'd to as modified on recons*, 225 Or App 257, 201 P3d 912 (2009), *aff'd in part*, 349 Or 117, 241 P3d 710 (2010), *adh'd to as modified on recons*, 349 Or 657, 249 P3d 111 (2011) (applying *noscitur a sociis* when

---

[2] The exclusion's catchall phrase—"or similar structure"—also lacks a plain meaning. We ordinarily assume "that a nonspecific term in a series * * * shares the same qualities as the specific terms that precede it." *ZRZ Realty v. Beneficial Fire and Casualty Ins.*, 349 Or 117, 140-41, 241 P3d 710 (2010), *adh'd to as modified on recons*, 349 Or 657, 249 P3d 111 (2011). Because it is plausible that the listed structures could either refer to exclusively residential structures or could include mixed-use structures, it is plausible that a structure could be "similar" to the enumerated structures because it contains only residential units or "similar" because it is a multi-unit structure. Accordingly, the exclusion's catchall term fails to render plaintiff's construction untenable.

construing an insurance policy). The fact that the phrase being defined is "Multi-Unit *Residential* Building" (emphasis added) also supports plaintiff's construction because an ordinary purchaser of insurance could reasonably understand the listed structures to refer only to exclusively residential buildings.[3] *See Webster's* at 1931 (defining "residential" in relevant part to mean "adapted or restricted to or occupied by residences" or "of, relating to, or connected with residence or residences").

We find additional support for plaintiff's construction in *Admiral Insurance Company v. Joy Contractors, Inc.*, 19 NY3d 448, 457-58, 972 NE2d 103, 107-08 (2012), in which the New York Court of Appeals held that issues of fact precluded summary judgment on the applicability of a policy exclusion for "residential construction activities." There, the policy defined "residential construction activities" to mean "any work or operations related to the construction of single-family dwellings, multi-family dwellings, *condominiums*, townhomes, townhouses, cooperatives and/or apartments." *Id.* at 455, 972 NE2d at 106 (internal quotation marks omitted; emphasis added). On appeal, the court concluded that summary judgment was inappropriate because it was unclear from the record whether the "condominium" building at issue was "residential" or "mixed-use." *Id.* at 458, 972 NE2d at 108. In so concluding, the court reasoned that the exclusion for "residential construction activities" did not apply to "a residential building with commercial or retail space (*i.e.*, a 'mixed-use' building)." *See id.* (citing *Bovis Lend Lease LMB, Inc. v. Royal Surplus Lines Ins. Co.*, 806 NYS2d 53, 60-61, 27 AD3d 84, 93-94 (2005) (concluding that a similar residential-construction exclusion did not unambiguously apply to a mixed-use building because such buildings were not expressly excluded from coverage, and it was "reasonable to interpret the exclusion as inapplicable to mixed-use buildings")). The court's analysis lends support to the conclusion that the term "condominium," at least when listed along with other terms connoting residential use such as

---

[3] Although the policy exclusion states that it applies to "*any* 'multi-unit residential building'" (emphasis added), the term "any" does not unambiguously preclude plaintiff's construction because it adds no content to the phrase "Multi-Unit Residential Building," which itself lacks a plain meaning.

"apartment," can be plausibly understood to have an exclusively residential meaning.[4]

AFM nevertheless argues that the second portion of the definition of "Multi-Unit Residential Building" renders plaintiff's construction of the exclusion untenable. The exclusion provides that one of the listed structures falls under the exclusion if it "has greater than eight units built or used for the purpose of residential occupancy." AFM argues that, if one interprets the phrase "Multi-Unit Residential Building" to mean an exclusively residential structure, then the reference to "units built or used for the purpose of residential occupancy" would be superfluous. Even if AFM is correct that this interpretation leads to some degree of redundancy, that does not render the definition nonsensical or meaningless, and therefore, it is not dispositive to the analysis, which turns on how policy terms would be understood by the ordinary purchaser of insurance. *See Congdon*, 256 Or App at 87; *see also State v. Lane*, 357 Or 619, 629, 355 P3d 914 (2015) ("[R]edundancy is a fact of life and of law." (Internal quotation marks omitted.)). Thus, plaintiff's construction of the exclusion remains plausible when viewed in its immediate context, and nothing in the broader context of the policy as a whole renders plaintiff's construction implausible. *See Laird v. Allstate Ins. Co.*, 232 Or App 162, 167, 221 P3d 780 (2009), *rev den*, 348 Or 414 (2010) (explaining that we examine "both the immediate context in which [a term] is used and the broader context of the policy as a whole to determine whether there remains any ambiguity about what the parties [to the policy] intended" (second set of brackets in original; internal quotation marks omitted)).

Because it remains ambiguous whether a mixed-use building qualifies as a "Multi-Unit Residential Building" under the policy, we construe the phrase against AFM, the drafter, and in favor of coverage. *See Dewsnup*, 349 Or at 40 ("If two or more plausible interpretations still remain,

---

[4] Although New York courts do not use Oregon's methodology for construing insurance policies, the analysis in *Admiral Insurance* nevertheless supports our conclusion that the exclusion is ambiguous. *See Fred Shearer & Sons, Inc. v. Gemini Ins. Co.*, 237 Or App 468, 481-82, 240 P3d 67 (2010), *rev den*, 349 Or 602 (2011) (relying on cases from other jurisdictions to buttress conclusion that a policy exclusion was ambiguous).

we construe the term against the drafter and in favor of the insured."). We therefore construe the term "Multi-Unit Residential Building" to mean an exclusively residential structure that contains more than eight units built or used for residential occupancy. For that reason, we conclude that the trial court erred in granting AFM's motion for summary judgment.

### ISSUES OF FACT REGARDING COVERAGE

In its second assignment of error, plaintiff contends that the trial court should have granted its motion for summary judgment. Plaintiff argues that it met its *prima facie* burden of proving coverage under the policies because the underlying judgments established that WGC, AFM's insured, became legally obligated to pay the money awards as a result of covered "property damage," and AFM failed to establish a dispute of material fact that precluded summary judgment. In addressing this assignment of error, we recount additional facts pertinent to our analysis, viewed in the light most favorable to AFM as the nonmoving party. *See Mid-Valley Resources*, 280 Or App at 790.

As stated above, the garnishment proceeding involved two default judgments. First, in the principal liability suit, plaintiff asserted claims directly against Sherwood, the developer, and White, the general contractor, demanding "all sums needed to repair the damage and correct the Defects and deficiencies." Sherwood subsequently named various subcontractors (including WGC) as third-party defendants and asserted common-law indemnity, contractual indemnity, and contribution claims against them. Sherwood's contractual indemnification claim against WGC rested on subcontracts in which WGC agreed to "indemnify and hold harmless General Contractor and/or Owner * * * from and against any and all claims, damages, losses, and expenses, including attorney's fees arising out of or resulting directly or indirectly from the performance of [WGC's work], whether relating to personal injury, death, property damage, actual or alleged violation of patent rights or otherwise."

After WGC failed to appear, the trial court entered an order of default against WGC. Subsequently, plaintiff, Sherwood, White, and all third-party defendants (with the

exception of WGC) entered into a settlement agreement disposing of all claims alleged in the lawsuit except for the claims asserted against WGC. The settlement agreement allocated the amounts that each defendant was to pay, but did not specify the amounts reflecting particular repairs or claims. Sherwood agreed to pay $900,000, and White agreed to pay $1,610,000. In addition, Sherwood agreed to seek a default judgment against WGC, and both Sherwood and White assigned to plaintiff "all rights against [WGC], including but not limited to all rights to any default judgment entered by the court."

In accordance with the settlement agreement, Sherwood sought a default judgment and money award against WGC. At a *prima facie* hearing, Sherwood offered the testimony of Cadd, a construction-defect consultant, who testified about "numerous defects" in the siding that WGC had installed on Buildings B and C. Cadd testified that the defects had led to water intrusion and damage to both buildings, requiring removal and replacement of the siding, among other repairs. Cadd opined that WGC was responsible for 35 percent of the repair costs. Sherwood also offered the testimony of a "repair estimator" who provided an estimate of the total cost to repair Buildings B and C based on Cadd's repair recommendations.

Sherwood argued to the trial court that, because WGC had contracted to indemnify not only White, but also Sherwood, WGC was liable for a proportionate share of both the $900,000 settlement amount paid by Sherwood and the $141,013.94 in costs and fees that Sherwood incurred in defending the lawsuit. Those figures, totaling $1,041,013.94, represented Sherwood's costs with respect to the entire lawsuit, including Buildings A, B, and C. Because WGC performed work only on Buildings B and C, however, Sherwood's counsel proposed that the total be reduced pro rata to $694,009.29 for purposes of calculating WGC's liability. Then, based on Cadd's testimony that WGC was 35 percent responsible for the repairs, Sherwood argued that the total amount of WGC's liability was $242,903.25.

The court entered a limited judgment in favor of Sherwood against WGC in the amount of $242,903.25. The

judgment stated that the court's ruling was based, among other things, on Cadd's testimony as to "his finding of damage to building components behind the siding and stone veneer on both buildings as a result of WGC's defective siding installation," Cadd's apportionment to WGC of 35 percent of the overall responsibility for repairs to Buildings B and C, testimony from Cadd and the repair estimator regarding the cost to repair Buildings B and C, and a declaration from Sherwood's counsel regarding the amount of costs and attorney fees incurred in the litigation.

The second default judgment was entered in an indemnity action following the settlement. In that action, plaintiff, as White's assignee, alleged that WGC was obligated to indemnify White for part of its contribution to the settlement of plaintiff's claims. The complaint alleged that, of the $1,610,000 that White had paid to plaintiff, WGC was responsible for $375,666.66, which constituted 35 percent of the settlement amount associated with Buildings B and C. At a *prima facie* hearing, Cadd testified, similar to his testimony in the other proceeding, that WGC had installed siding that was defective and caused damage to Buildings B and C, and that WGC was responsible for 35 percent of the repair costs.

The court entered a general judgment against WGC in the amount of $375,666.66, plus $17,795.50 in attorney fees and $3,080.40 in costs. The judgment stated that the court had considered, among other things, testimony from Cadd, including his "finding of physical injury and damage to building components due to the faulty work of [WGC]," his apportionment of 35 percent of the overall responsibility for repairs to Buildings B and C, and the indemnification clauses in the subcontracts between WGC and White.

Having obtained the two default judgments against WGC, plaintiff sent AFM writs of garnishment for the amounts in those judgments. In its answer to plaintiff's allegations, AFM argued that it was not obligated to pay the sums garnished because the judgments reflected amounts that did not arise from "property damage" or an "occurrence" within the meaning of AFM's policy. AFM also asserted

that, to the extent that any damages were for covered "property damage," one or more exclusions applied to the loss.

Plaintiff then moved for summary judgment, arguing, among other things, that AFM could not meet its burden to prove that any policy exclusion applied. In support of its motion, plaintiff submitted a declaration from Cadd, stating that, at both hearings, he had testified "[i]n essence" that

> "the work of [WGC] had serious waterproofing workmanship related deficiencies, and that these defects in their work allowed water to enter the building envelopes of the two buildings, which resulted in physical damage to underlying components including wood sheathing, wood framing, interior gypsum wallboard (sheetrock), paint, insulation, and other materials that were not installed by [WGC]."

In opposition to summary judgment, AFM pointed to a number of exclusions in the policy, arguing that there remained disputed factual questions as to the extent of excluded damages. One such exclusion applies to faulty-work repairs—defined as "[t]hat particular part of any property that must be restored, repaired or replaced because [WGC's] work was incorrectly performed on it," unless the "property damage" at issue "ar[ose] out of" WGC's work after it was complete. AFM also pointed to a separate exclusion for damage to "[WGC's own] work arising out of it or part of it." Thus, AFM argued that its policy did not cover the cost to replace or repair the siding that WGC improperly installed, nor did the policy cover the cost to repair consequential damage to the siding that WGC had installed insofar as that damage was caused by defects in WGC's own work. In essence, AFM argued that, (1) because the damages alleged by plaintiff in the first liability suit included such "excluded" costs, and (2) because those same costs were encompassed by the default judgments, those judgments necessarily included amounts for which AFM was not liable under its policy.

AFM also submitted a declaration pursuant to ORCP 47 E[5] stating that it had retained an expert who

---

[5] ORCP 47 E provides, in relevant part:

"If a party, in opposing a motion for summary judgment, is required to provide the opinion of an expert to establish a genuine issue of material fact,

would support AFM's contentions at trial by testifying that, among other things,

> "The repair scope and bids that were the basis of the damages claimed against the defendants and third-party defendants included line items for the cost to repair defects in the work performed by [WGC] on the buildings that are the subject of the claims in this action;

> "That work required to repair defects in WGC's work on the buildings that are the subject of the claims in this action would have been required even if there had been no underlying water damage;

> "* * * * *

> "Some, but not all, of the underlying water damage repairs required removal and replacement of WGC's faulty work on the buildings that are the subject of the claims in this action;

> "Based on the repair scope and bids that were the basis of the damages claimed against the defendants and third party defendants in this action it is possible to determine the amount of estimated repair costs that were allocated to the repair of faulty work performed by WGC, and the amount of estimated repair costs that were allocated to the repair of consequential damage caused by defects in the faulty work of WGC[.]"[6]

The trial court denied plaintiff's motion for summary judgment. On appeal, plaintiff argues that it was entitled to summary judgment because it met its burden to prove that AFM was obligated to pay both judgment awards

---

an affidavit or a declaration of the party's attorney stating that an unnamed qualified expert has been retained who is available and willing to testify to admissible facts or opinions creating a question of fact, will be deemed sufficient to controvert the allegations of the moving party and an adequate basis for the court to deny the motion. The affidavit or declaration shall be made in good faith based on admissible facts or opinions obtained from a qualified expert who has actually been retained by the attorney who is available and willing to testify and who has actually rendered an opinion or provided facts which, if revealed by affidavit or declaration, would be a sufficient basis for denying the motion for summary judgment."

[6] The declaration also averred that AFM's expert would testify as to other factual issues bearing upon coverage. Because we do not reach whether plaintiff met its burden to prove coverage as a matter of law, we do not describe that portion of the ORCP 47 E declaration.

in their entirety, and AFM failed to establish that there existed a disputed issue of material fact that precluded summary judgment in plaintiff's favor.

Because plaintiff proceeded directly against AFM under ORS 18.352[7] for the judgment awards entered against WGC, plaintiff stood in the shoes of WGC, and AFM was entitled to raise any defenses against plaintiff's claims that AFM could have asserted against WGC as its insured. *Brownstone Homes Condo. Assn. v. Brownstone Forest Hts.*, 358 Or 223, 230-31, 363 P3d 467 (2015); *State Farm Fire & Cas. v. Reuter*, 299 Or 155, 166-67, 700 P2d 236 (1985). Accordingly, plaintiff "ha[d] the burden to prove coverage," while AFM "ha[d] the burden to prove an exclusion from coverage." *FountainCourt Homeowners v. FountainCourt Develop.*, 360 Or 341, 360, 380 P3d 916 (2016) (internal quotation marks omitted). Thus, plaintiff had the burden of proving that the judgment awards were for sums that WGC had become "legally obligated to pay as damages because of * * * 'property damage'" to which AFM's insurance policy applied and that there had been a coverage-triggering "occurrence" within the meaning of that policy. *See id.* AFM, by contrast, had the burden to prove the applicability of policy exclusions, including the exclusions for faulty-work repairs and for consequential damage to WGC's own work. *See id.* Thus, in response to plaintiff's motion for summary judgment, AFM had the burden to show a disputed question of material fact regarding the application of any policy exclusions. *See* ORCP 47 C; *Two Two v. Fujitec America, Inc.*, 355 Or 319, 324, 325 P3d 707 (2014) ("[U]nder ORCP 47 C, the party opposing summary judgment has the burden of producing evidence on any issue 'raised in the motion' as to which the adverse party would have the burden of persuasion."). As explained below, we conclude that AFM met its burden by offering evidence that both default judgments encompassed amounts dedicated to repairs that fell under

---

[7] As stated above, ORS 18.352 provides:

"Whenever a judgment debtor has a policy of insurance covering liability, or indemnity for any injury or damage to person or property, which injury or damage constituted the cause of action in which the judgment was rendered, the amount covered by the policy of insurance shall be subject to attachment upon the execution issued upon the judgment."

the faulty-work and consequential-damage exclusions. *See Farmers Ins. Co. v. Munson,* 145 Or App 512, 519-20, 930 P2d 878 (1996), *rev den,* 325 Or 368 (1997) (reasoning that the application of the insurance policy's terms to particular historical circumstances is a question of fact).

The amounts sought in the two *prima facie* hearings were based on sums paid by Sherwood and White respectively under the settlement agreement. The settlement agreement was, by its terms, intended to constitute a complete settlement of all of plaintiff's claims "based upon the allegations asserted in the lawsuit." The damages alleged by plaintiff in the lawsuit included "all sums needed to repair the damage and correct the [d]efects and deficiencies." As noted above, the settlement agreement included allocations of financial responsibility to the settling defendants, but it did not include an itemized accounting of the specific types of repairs for which the settling parties were responsible. As a result, the settlement agreement establishes only that the amounts paid were for the relief sought in the complaint, which included both amounts "to repair the damage" and to "correct the [d]efects and deficiencies." Without further detail, it is impossible to ascertain whether the settlement agreement made Sherwood or White liable for repairs that were excluded from coverage under WGC's policy with AFM. *Cf. FountainCourt Homeowners,* 360 Or at 361-62 (concluding that the judgment and record demonstrated as a matter of law that the damage award was for "property damage" as defined in the policy because the jury was constrained to award damages for "physical damage").

We also observe that, although Cadd testified that WGC was responsible for 35 percent of the repair costs for the "damage and [d]efects" to Buildings B and C, the record does not establish the extent, if any, to which those repair costs included repairs to WGC's faulty work and for consequential damage to WGC's work. Cadd stated, however, that the necessary repairs included removing and replacing the siding on Buildings B and C, which would support an inference that some portion of the repair estimate may have included the cost to replace faulty siding or to repair damage to siding installed by WGC that was caused by WGC's

faulty work; such amounts could be subject to the policy exclusions.

Thus, contrary to plaintiff's view, AFM presented evidence that the default judgments may have imposed liability on WGC for costs that, in turn, are excluded from the terms of WGC's policy with AFM. AFM's ORCP 47 E declaration established that it could provide expert testimony as to whether, as a factual matter, the repair estimate included repairs for which AFM had no duty to indemnify WGC. Accordingly, AFM met its burden, and the trial court did not err in denying plaintiff's motion for summary judgment. *Cf. Holloway v. Republic Indemnity Co. of America*, 201 Or App 376, 392, 119 P3d 239 (2005), *rev'd on other grounds*, 341 Or 642, 147 P3d 329 (2006) (concluding that neither party was entitled to summary judgment because the parties' submissions did not establish the actual facts necessary to determine whether the insurer had duty to indemnify for a settlement of all of the alleged claims).

Plaintiff also argues that the repair estimate has no bearing on the question of whether the judgments were covered by AFM's policies. To that end, plaintiff argues that the judgments establish that WGC became liable for the settlement amounts "because of" covered "property damage," and, therefore, an inquiry into the facts that formed the basis for the settlement is unnecessary to determine AFM's liability. We disagree. Although plaintiff is correct that the judgments conclusively establish the extent of WGC's liability, the judgments and record are not sufficient as a matter of law to establish that AFM is liable under the policies for the entire amount awarded in the two judgments. The purpose of examining the facts underlying the settlement is not to retry or alter WGC's liability, but to determine, as a matter of contract law, the extent of AFM's liability for amounts owed by WGC. *See FountainCourt Homeowners*, 360 Or at 357 (reasoning that an insurance-coverage proceeding "requires the court to evaluate—as a matter of contract law—what, precisely, the insured has become legally obligated to pay as damages in the prior proceeding, in order to determine whether the policy covers those damages," while emphasizing that "an insurer cannot, in a subsequent

proceeding, retry its insured's liability, or alter the nature of the damages awarded in that proceeding").

Thus, AFM met its burden to establish that there was a genuine issue of material fact as to its liability for the full amount garnished. Consequently, the trial court did not err in denying plaintiff's motion for summary judgment.[8]

## ATTORNEY FEES AND COSTS

We turn to AFM's first cross-assignment of error. AFM argues that the trial court erred in denying its alternative motion for partial summary judgment, in which AFM sought release from the writs of garnishment to the extent that they encompass attorney fees and costs awarded in the underlying judgments against WGC.

As stated above, both judgment awards included attorney fees and costs incurred by Sherwood and White respectively in litigating the action. The subcontracts between WGC and White provided that WGC was obligated to indemnify both White and Sherwood "from and against any and all claims, damages, losses, and expenses, including attorney's fees arising out of or resulting directly or indirectly from the performance of [WGC's] work." Both Sherwood and plaintiff (as White's assignee) relied upon that provision to demonstrate entitlement to those expenses. In the garnishment proceeding, AFM moved for partial summary judgment, arguing that it was not liable under the policy for those portions of the judgments that were for attorney fees and costs for which WGC was contractually liable. The trial court denied AFM's motion.

The policy contains two provisions relevant to this assignment of error. First, the policy provides that AFM "will pay those sums that the insured becomes legally obligated to pay as damages because of * * * 'property damage' to which this insurance applies." Second, in a section entitled "Supplementary Payments," the policy provides:

"We will pay, with respect to any claim we investigate or settle, or any 'suit' against an insured we defend:

---

[8] We express no view as to whether plaintiff met its burden to prove that, as a matter of law, the judgments represented sums that WGC became legally obligated to pay because of "property damage" within the meaning of the policy.

"*****

"e.   All costs taxed against the insured in the 'suit.'"

The trial court concluded that the phrase "costs taxed against the insured" is ambiguous with respect to whether it includes attorney fees or other litigation expenses. Thus, construing the provision against AFM, the trial court denied AFM's motion.

On appeal, AFM argues that the attorney fees and "defense costs" awarded pursuant to the subcontract between WGC and White are neither "damages" that WGC became legally obligated to pay, nor "costs taxed against the insured" within the meaning of the policy. With respect to the first provision, AFM argues that "damages" refers to "compensation for past injury," and that "[a]ttorney fees and defense expenses are not awarded to compensate a prevailing plaintiff for the injury that spawned the lawsuit." AFM also argues that attorney fees are not covered as "costs taxed against the insured" because the term "costs" as used in ORCP 68 A(2) does not include expenses incurred "for legal services."

We first address AFM's argument that attorney fees and costs are not "damages" within the meaning of the policy. We agree with AFM that the term "damages," in the ordinary sense, refers to monetary compensation for a wrong or injury suffered. *See Webster's* at 571 (defining "damages" to mean "the estimated reparation in money for detriment or injury sustained" or "compensation or satisfaction imposed by law for a wrong or injury caused a violation of a legal right"); *Black's* at 471 (defining "damages" to mean "Money claimed by, or ordered to be paid to, a person as compensation for loss or injury"). We disagree, however, that attorney fees and other litigation expenses can never constitute "damages."

Oregon adheres to the so-called American rule, by which a party cannot recover attorney fees in the absence of a statutory or contractual basis for such recovery. *Montara Owners Assn. v. La Noue Development, LLC*, 357 Or 333, 360, 353 P3d 563 (2015). That rule does not apply, however, when attorney fees are claimed as consequential damages

"on the theory that the defendant's tortious or wrongful conduct involved the plaintiff in litigation with a third party." *Id.* at 361 (internal quotation marks omitted). Thus, even absent a contractual or statutory basis for recovery, when "'a breach of contract results in claims by third persons against the injured party,' the breaching party is liable for the injured party's 'reasonable expenditures in the litigation, if the party in breach had reason to foresee such expenditures as the probable result of his breach at the time he made the contract.'" *Id.* (quoting *Restatement (Second) of Contracts* § 351 comment c (1979)); *see also Raymond v. Feldmann*, 124 Or App 543, 546-47, 863 P2d 1269 (1993), *rev den*, 318 Or 381 (1994) (discussing the third-party litigation exception).

In this case, because plaintiff's claims against Sherwood and White arose, in part, from WGC's deficient work, WGC was liable to Sherwood and White for a proportion of the expenses incurred in defending against and settling plaintiff's claims. Accordingly, those expenses could potentially qualify as consequential damages recoverable by Sherwood and White against WGC, even in the absence of the contractual indemnity provision. Thus, to the extent that the attorney fees and costs awarded to Sherwood and plaintiff (as White's assignee) against WGC are properly considered consequential damages, they constitute "damages" within the meaning of the policy. Such damages do not, however, include those expenses incurred by Sherwood and White in litigating claims *directly* against WGC, as those expenses are not subject to the third-party litigation exception. We turn to whether the remaining expenses are properly considered "costs taxed against the insured" within the meaning of the policy's "Supplementary Payments" provision.

The term "costs" is not defined in the policy. Under applicable rules for insurance-policy construction, we look to dictionary definitions to determine whether the term has a plain meaning. *See Ortiz*, 244 Or App at 360. *Webster's* defines "costs" in pertinent part, to mean

"expenses incurred in litigation: as **a :** those payable to the attorney or counsel by his client esp. when fixed by law **b:** those given by the law or the court to the prevailing against the losing party in equity and frequently by statute – called also *bill of costs*[.]"

*Webster's* at 515 (boldface and emphasis in original). *Black's Law Dictionary* defines "costs," in relevant part, to mean:

> "**2.** (*pl.*) The charges or fees taxed by the court, such as filing fees, jury fees, courthouse fees, and reporter fees. — Also termed *court costs*. **3.** (*pl.*) The expenses of litigation, prosecution, or other legal transaction, esp. those allowed in favor of one party against the other. * * * Some but not all states allow parties to claim attorney's fees as a litigation cost. — Also termed (in sense 3) *litigation costs*; (in senses 2 & 3) *legal costs.*"

*Black's* at 423 (boldface and emphases in original). As those definitions make clear, the term "costs" when used in the ordinary sense can either refer to *all* expenses incurred in litigation—including attorney fees—or it can refer to specific types of litigation expenses—sometimes, but not always, including attorney fees. Based on those definitions, we conclude that the term "costs" lacks a plain meaning, and we turn to the context of the policy as a whole to determine whether it is plausible that the parties intended the term "costs" to include attorney fees and expert expenses.

With respect to the immediate context of the term "costs," we note that the phrase "costs taxed" is similar to the phrase "taxable cost," which refers to a "litigation-related expense that the prevailing party is entitled to as part of the court's award." *Black's* at 423. That definition supports a construction of "costs taxed" as including any litigation-related expenses awarded to a prevailing party, with no exception for attorney fees.

AFM argues that because, in a separate provision, the policy specifically refers to "attorney fees and necessary litigation expenses," it follows that the parties did not intend the term "costs" to include "attorney fees and necessary litigation expenses." Although it is true that, as a general matter, we presume that contracting parties intend that each word in a contract to carry independent significance, we disagree that the use of the phrase "attorney fees and necessary litigation expenses" renders plaintiff's interpretation of "costs taxed against the insured" implausible. As plaintiff correctly points out, it is plausible that the phrase "attorney fees and necessary litigation expenses" refers to a particular

subset of "costs," while "costs" refers to a broader category of expenses that includes attorney fees.[9]

Accordingly, because construing the term "costs" to include attorney fees and expert expenses remains plausible after examining the ordinary meaning of the word within the context policy as a whole, we conclude that the phrase is ambiguous, and the trial court properly construed it against AFM as the drafter. *See Dewsnup*, 349 Or at 40 ("If two or more plausible interpretations still remain, we construe the term against the drafter and in favor of the insured."). Therefore, the trial court did not err in denying AFM's motion for partial summary judgment.

## RIGHT TO TRIAL BY JURY

In light of our conclusion that there remained disputed questions of material fact with respect to the applicability of policy exclusions, we turn to AFM's second cross-assignment of error, in which it argues that it was entitled to have a jury resolve disputed questions of fact necessary to determine its liability under the policy. We review the denial of a request for a jury trial for legal error. *See State v. N. R. L.*, 249 Or App 321, 322, 277 P3d 564 (2012), *aff'd*, 354 Or 222, 311 P3d 510 (2013).[10]

---

[9] AFM also argues that we must read the term "costs" in the insurance policy to carry the same meaning as "costs" under ORCP 68 A(2) (defining "[c]osts and disbursements" in relevant part to mean "reasonable and necessary expenses incurred in the prosecution or defense of an action, *other than for legal services*" (emphasis added)). There is, however, no indication that the parties intended to incorporate into the policy a definition of "costs" as used in Oregon law as opposed to the ordinary meaning of the term. *See Boly v. Paul Revere Life Ins. Co.*, 238 Or App 702, 709, 246 P3d 1 (2010), *rev den*, 350 Or 130 (2011) (reasoning that, when interpreting an insurance policy, "we are guided by the principle that it is the common understanding of the term which must be used and not its technical meanings" (internal quotation marks omitted)). *Cf. Employers-Shopmens Local 516 v. Travelers*, 235 Or App 573, 584, 235 P3d 689 (2010), *rev den*, 349 Or 654 (2011) (interpreting policy terms with reference to a federal statutory scheme "because the text of the [policy] strongly suggests an intention that, at the very least, the pertinent provisions of the [federal] regulatory scheme provide context for understanding the meaning of those terms"). In the absence of such intent, we cannot conclude that the meaning of "[c]osts and disbursements" as used in ORCP 68 A(2) renders plaintiff's construction of the phrase "costs taxed against the insured" implausible.

[10] The Supreme Court has not previously addressed whether, or under what circumstances, ORS 18.782 violates a party's jury-trial rights in a contested garnishment proceeding. *See FountainCourt Homeowners*, 360 Or at 360 (declining to address the defendant's jury-trial argument on review because it had failed to

ORS 18.782 provides that, in a contested garnishment hearing at which the garnishee's liability is determined, "[t]he proceedings against a garnishee shall be tried by the court as upon the trial of an issue of law between a plaintiff and defendant." AFM argues that the statute violates the constitutional jury-trial guarantee insofar as it compels parties in a garnishment hearing to resolve insurance-coverage disputes by way of a bench trial. AFM argues that, under Article I, section 17, it was entitled to a jury trial on disputed questions of fact underlying the coverage dispute because the garnishment proceeding was, in essence, a breach-of-contract action.[11]

Before we consider the constitutional question, we must first decide whether the legislature intended to preclude a party from a jury trial in a contested garnishment proceeding conducted pursuant to ORS 18.782.[12] *See M. K. F. v. Miramontes*, 352 Or 401, 404, 287 P3d 1045 (2012) (considering whether the statute itself guaranteed a jury-trial right before turning to the constitutional question); *Goodyear Tire & Rubber Co. v. Tualatin Tire & Auto*, 322 Or 406, 414, 908 P2d 300 (1995), *modified on reh'g*, 325 Or 46, 932 P2d 1141 (1997) (reasoning that, "only if we determine that the legislature did not intend to provide a jury trial, we determine whether a jury trial is nonetheless required by Article I, section 17, or Article VII (Amended), section 3"). We must therefore construe the intended meaning of the phrase "tried by the court as upon the trial of an issue of law" as found in ORS 18.782.[13] To discern the meaning intended by the

raise on direct appeal any arguments with respect to factual questions bearing upon application of policy exclusions).

[11] Plaintiff's argument in response was that the issues in the garnishment proceeding did not present questions of fact, and therefore, AFM had no right to a trial by jury. Because, as stated above, we disagree with plaintiff that there were no disputed questions of fact, we reject plaintiff's argument.

[12] We note that neither party offers arguments bearing upon the construction of the statute or whether the legislature actually intended that insurance-coverage disputes in garnishment proceedings should be tried without a jury. Regardless, we have an independent duty to correctly construe the statute. *See Stull v. Hoke*, 326 Or 72, 77, 948 P2d 722 (1997) ("In construing a statute, [an] appellate court] is responsible for identifying the correct interpretation, whether or not asserted by the parties.").

[13] In *FountainCourt Homeowners*, the Supreme Court stated in *dictum* that "the garnishment statutes," including ORS 18.782, contemplate that a contested garnishment hearing "will be resolved by a trial to court." 360 Or at 359. Because

legislature, we examine the text and context of the statute, and, when appropriate, its legislative history and relevant canons of construction. *Dowell v. Oregon Mutual Ins. Co.*, 361 Or 62, 67, 388 P3d 1050 (2017) (citing, *inter alia, State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009)).

We first turn to the phrase "tried by the court." That phrase has a well-established legal meaning that we assume the legislature intended, and the case law reflects that well-established meaning. *State v. Dickerson*, 356 Or 822, 829, 345 P3d 447 (2015) (giving legal terms "their established legal meanings"); *Joshi v. Providence Health System*, 342 Or 152, 158, 149 P3d 1164 (2006) (assuming that, in using a legal term, "the legislature intended to incorporate the legal meaning of that term that this court has developed in its cases"). A trial by the court, also referred to as a "bench trial" or a "court trial," is a trial in which both questions of fact and questions of law are decided by the judge, and no jury is empaneled. *See Black's* at 1735 (defining "bench trial" to mean a "trial before a judge without a jury" in which the "judge decides questions of fact as well as questions of law[,] — [a]lso termed *trial to the bench*; *nonjury trial*; *court trial*; *trial before the court (TBC)*; *judge trial*" (emphasis in original)); *Garner's Dictionary of Legal Usage* 106 (3d ed 2011) (defining "bench trial" as a "common equivalent of *trial to the bench* (= a nonjury trial)" (emphasis in original)); *see, e.g., Tully v. Tully*, 213 Or 124, 125, 322 P2d 1085 (1958) ("A jury trial being waived, the issue was tried to the trial court."). Accordingly, the legislature's use of the phrase "tried by the court" strongly indicates that the legislature intended that the judge—and not a jury—determine all issues of fact and law in a contested garnishment hearing conducted pursuant to ORS 18.782.

That conclusion is reinforced by the fact that ORS 18.782 provides that the issues will be "tried by the court *as upon the trial of an issue of law*" (emphasis added). It is well established that the adjudication of an "issue of law" is generally the province of the judge, while an "issue of fact"

the Supreme Court did not conclusively construe ORS 18.782, we do so here before turning to the constitutional question.

is ordinarily determined by a jury. *See, e.g.*, ORS 136.030 ("An issue of law shall be tried by the judge of the court and an issue of fact by a jury of the county in which the action is triable."); ORCP 51 (providing that an "issue of law shall be tried by the court," while the "trial of all issues of fact shall be by jury unless [the parties consent to a bench trial or the court determines that no right to a jury exists either by statute or under the Oregon Constitution]"); *see also State v. Pacific Live Stock Co.*, 93 Or 196, 199, 182 P 828 (1919) ("An issue of law is tried before the judge, and an issue of fact is ordinarily tried before a jury."); *Shobert v. May*, 40 Or 68, 72, 66 P 466 (1901) (reasoning that, when the undisputed facts show that the plaintiff has not met his burden of production, the "court may take the case from the jury and decide the issue as a question of law"). Thus, the legislature's inclusion of the phrase "as upon the trial of an issue of law" confirms that the legislature intended that a hearing conducted pursuant to ORS 18.782 would proceed without a jury.

We find further support for that conclusion upon review of prior versions of ORS 18.782. *See Northwest Natural Gas Co. v. City of Gresham*, 359 Or 309, 322, 374 P3d 829 (2016) ("Context * * * includes statutes enacted simultaneously as well as prior versions of the same statute."). Prior to 1981, *former* ORS 29.350 (1965), *repealed by* Or Laws 1981, ch 883, § 1; Or Laws 1981, ch 898, § 53, provided:

> "Witnesses, including the defendant and garnishee or officer thereof, may be required to appear and testify, and the issues shall be tried, upon proceedings against a garnishee, as upon the trial of *an issue of fact* between a plaintiff and defendant."

(Emphasis added.); *see also Argonaut Ins. Co. v. Ketchen*, 243 Or 376, 379-80, 413 P2d 613 (1966) (holding that *former* ORS 29.350 (1965) required that a garnishment proceeding be "tried with a jury unless the parties waive a jury trial"). In 1981, the legislature replaced *former* ORS 29.350 (1965) with *former* ORS 29.343 (1983), *repealed by* Or Laws 2001, ch 249, § 84, and thereby altered the statute to provide that "the issues shall be tried, upon proceedings against a garnishee, as upon the trial of *an issue of law* between a plaintiff and defendant." Or Laws 1981, ch 883, § 24 (emphasis

added). In 2001, the legislature again replaced the statute, adding the additional language that the proceedings "shall be tried by the court." *See* Or Laws 2001, ch 249, §§ 54, 84. *Compare former* ORS 29.343 (1983) ("[T]he issues shall be tried, upon proceedings against a garnishee, as upon the trial of an issue of law between a plaintiff and defendant."), *with* ORS 18.782 ("The proceedings against a garnishee *shall be tried by the court* as upon the trial of an issue of law between a plaintiff and defendant." (Emphasis added.)). Those targeted changes provide strong support for the conclusion that the legislature intended to eliminate the role of juries in contested garnishment proceedings conducted pursuant to ORS 18.782.

Because we conclude that the legislature intended to preclude a jury trial on disputed issues of fact in a hearing conducted under ORS 18.782, we turn to whether that violates the Oregon Constitution as applied to these circumstances. Article I, section 17, provides, "In all civil cases the right of Trial by Jury shall remain inviolate." *See also* ORCP 50 ("The right of trial by jury as declared by the Oregon Constitution or as given by a statute shall be preserved to the parties inviolate."). Article I, section 17, "guarantees litigants a procedural right to have a jury rather than a judge decide those common-law claims and defenses that customarily were tried to a jury when Oregon adopted its constitution in 1857, as well as those claims and defenses that are of like nature." *Horton v. OHSU*, 359 Or 168, 250, 376 P3d 998 (2016) (internal quotation marks omitted). "The fact that a particular claim or request was not judicially recognized at the time that the constitution was adopted or that such a claim or request was created by the legislature thereafter does not necessarily mean that Article I, section 17, does not apply; it is the nature of the claim or request that is determinative." *State v. N. R. L.*, 354 Or 222, 226, 311 P3d 510 (2013). The right of trial by jury is to be broadly construed, and the right extends to a civil claim or request for relief absent a showing that, at common law, such claim or request would have been tried to the court without a jury. *Id.*; *see also State v. 1920 Studebaker Touring Car et al.*, 120 Or 254, 263, 251 P 701 (1927) ("[T]he constitutional right of trial by jury is not to be narrowly construed.").

Plaintiff's allegations in the garnishment proceeding were that AFM's policy provided coverage for the judgments entered against WGC, that AFM had not tendered payment for those judgments, and that plaintiff was entitled to a judgment against AFM for the total amount of the judgment awards entered against WGC, plus interest. *See* ORS 18.352 (providing that a judgment debtor may attach "the amount covered by the policy of insurance"). In essence, plaintiff's claim was that (1) AFM had a contractual duty to indemnify WGC for the judgment awards, *see Ledford v. Gutoski*, 319 Or 397, 405, 877 P2d 80 (1994) ("In order for the duty to indemnify to arise, the insured must be liable for harm or injury that is covered by the policy."); (2) that AFM had breached its duty to indemnify WGC for the judgments, *see Pritchard v. Regence BlueCross BlueShield*, 225 Or App 455, 460, 201 P3d 290, *rev den*, 346 Or 184 (2009) ("Generally, an insurance contract is breached when benefits are wrongfully denied by the insurer."); and (3) that WGC was entitled to damages in the amount covered by the policy, *see Northwest Pump v. American States Ins. Co.*, 144 Or App 222, 227, 925 P2d 1241 (1996) (reasoning that an insurer's duty to indemnify extends only so far as those amounts covered under the policy). Because plaintiff was standing in the shoes of WGC for purposes of the garnishment proceeding, *see Griffith v. Safeco Title Ins. Co.*, 107 Or App 270, 272, 812 P2d 420, *rev den*, 312 Or 150 (1991), its claims were not meaningfully distinct from a claim for breach-of-contract brought by WGC against AFM. *See Georgetown Realty v. The Home Ins. Co.*, 313 Or 97, 106, 831 P2d 7 (1992) ("If the plaintiff's claim is based solely on the breach of a provision in the contract, which itself spells out the party's obligation, then the remedy will be only in contract, with contract measures of damages * * *.").

Thus, insofar as plaintiff sought damages for AFM's breach of its duty to indemnify WGC, the relief sought is equivalent to that which was subject to trial by a jury at common law. *See Molodyh v. Truck Insurance Exchange*, 304 Or 290, 296-97, 744 P2d 992 (1987) ("[A] jury trial on factual issues concerning an insurance policy long has been an established practice in this country."); *see also Horton*, 359 Or at 247 ("*Molodyh* holds that, when the legislature

has made a factual issue part of a claim that is subject to Article I, section 17, the legislature may not assign that factual issue to any entity other than a jury."). The jury was traditionally charged with determining whether a breach of contract occurred and the amount of resulting damages, *Molodyh*, 304 Or at 296, and questions of breach and damages are precisely those at issue in the garnishment proceeding. Thus, in the absence of evidence that there was a historical exception to the right to a jury trial for garnishment or like proceedings, we cannot conclude that the proceeding was one to which the right to a jury trial does not attach.

Regardless of the legal mechanism used to resolve an insurance-coverage dispute, an insurer is not bound to pay a judgment entered against its insured unless it has had an opportunity to litigate—on its own behalf—the existence and extent of its duty to indemnify its insured. *See FountainCourt Homeowners*, 360 Or at 357-58; *see also Brownstone*, 358 Or at 230-31 (rejecting argument that the legal mechanism used to obtain insurance proceeds—in that case, a garnishment proceeding brought pursuant to ORS 18.353—precluded application of precedent bearing on the ability of an insured to assign claims against its insurer). Although the legislature is not precluded from permitting insurance-coverage disputes to take place in a garnishment proceeding, at the same time, the legislature is not free to abrogate a party's procedural jury-trial right in that proceeding. *See 1920 Studebaker Touring Car et al*, 120 Or at 264-69 (rejecting argument that the legislature may abrogate a party's right to a jury trial in a forfeiture proceeding by creating a "special statutory proceeding in rem against certain specific offending property"). Accordingly, we conclude that AFM is entitled to a jury determination of those disputed questions of fact that are determinative of its liability under the policy because the dispute mirrors a breach-of-contract claim to which the right to a jury trial attached at common law. *See Munson*, 127 Or App at 419 (holding that, "to the extent that th[e] case involves factual issues material to the application of [insurance] policy terms, the parties are entitled to a jury trial").

Because we conclude that AFM had the right to a jury trial in these circumstances, we conclude that, to the

extent that ORS 18.782 forces parties in a garnishment proceeding to litigate factual questions underlying an insurance-coverage dispute to the court, the statute is unconstitutional as applied. For that reason, the trial court erred in ruling that AFM was not entitled to a jury trial.

## CONCLUSION

In sum, we conclude that the trial court erred in granting AFM's summary judgment motion, but that it did not err in denying plaintiff's motion for summary judgment. We further conclude that the trial court did not err in denying AFM's alternative motion for partial summary judgment. Finally, we conclude that AFM had the right to a jury trial of disputed questions of fact bearing upon coverage under the policy.

Reversed and remanded.