562 December 4, 2024 No. 874

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
acting by and through the Oregon Youth Authority,
and Joseph O'Leary,
Director of Oregon Youth Authority,
*Plaintiffs-Appellants,*
*and*

JOHN DOES 1-10,
*Plaintiffs,*

*v.*

HAAG HOME FOR BOYS, INC.,
an Oregon corporation,
and American Family Home Insurance Company,
a foreign corporation doing business in Oregon,
*Defendants-Respondents.*

Lane County Circuit Court
21CV47604; A178805

Stephen W. Morgan, Judge.

Argued and submitted June 12, 2023.

Robert M. Wilsey, Assistant Attorney General, argued the cause for appellants. Also on the briefs were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Jared F. Kiess argued the cause for respondent American Family Home Insurance Company. Also on the brief was Michael A. Guadagno and Bullivant Houser Bailey, PC.

No appearance for respondent Haag Home for Boys, Inc.

Before Aoyagi, Presiding Judge, Lagesen, Chief Judge, and Landau, Senior Judge.*

_____

* Landau, S. J. *vice* Jacquot, J.

LANDAU, S. J.

As to plaintiffs' claim for declaratory relief, vacated and remanded for entry of a judgment declaring the rights of the parties; otherwise affirmed.

**LANDAU, S. J.**

Plaintiffs Oregon Youth Authority and its director (plaintiffs) appeal a limited judgment dismissing their claims against American Family Home Insurance Company (American) alleging that, under a policy of commercial general liability insurance, American has a duty to defend a wrongful death action against plaintiffs. The trial court concluded that an exclusion in that policy for the provision of "professional services" applies. We conclude that the trial court was correct.

## I.    BACKGROUND

A.  *Facts*

We take the following facts from the allegations of the complaint and the terms of the policies referred to in that complaint.

Haag Home for Boys, Inc. (Haag) operated a home for boys under a contract with OYA to provide "behavior rehabilitation services" for boys. "Behavior rehabilitation services" refers to a program "that provides services and placement-related activities" to clients "to address their debilitating psychosocial, emotional, and behavioral disorders in a community placement." OAR 410-170-0020(11). Haag's contract with OYA required Haag to maintain a commercial general liability insurance policy, an excess liability insurance policy, and a professional liability policy "covering damages caused by an error, omission or any negligent acts related to the services to be provided" by Haag. The contract required Haag to name OYA as an additional insured on the commercial general liability policy and on the excess liability policy, but not the professional liability policy.

Haag purchased all three types of insurance from American Family Home Insurance Company.

The commercial general liability policy provides that American will "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." The term "bodily injury" is defined in the policy to include death.  The policy further provides that American

"will have the right and duty to defend the insured against any suit seeking those damages."

The policy contains an exclusion:

"EXCLUSION – DESIGNATED PROFESSIONAL SERVICES

"This endorsement modifies insurance provided under the following:

"COMMERCIAL GENERAL LIABILITY COVERAGE PART

"SCHEDULE

"Description of Professional Services

"Assisted Care Living

"With respect to any professional services shown in the schedule, the following exclusion is added * * *:

"This insurance does not apply to any 'bodily injury,' 'property damage,' or 'personal and advertising injury' due to the rendering of or failure to render any professional service.

"This exclusion applies even if the claims against any insured allege negligence or wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured if the 'occurrence' which caused the 'bodily injury' or 'property damage' or the offense which caused the 'personal and advertising injury' involved the rendering of or failure to render any professional service."

The commercial general liability policy lists the State of Oregon as an additional insured.

As for professional liability policy, it provides that American will pay "those sums that the insured becomes legally obligated to pay" for injuries resulting from the provision of "professional social or healthcare services." That term is then defined to mean:

"1.   The rendering or failure to render:

"a.   Medical, surgical, dental, x-ray or nursing service, treatment, advice or instruction, or the related furnishing of food or beverages;

"b. Any health or therapeutic service, treatment, advice or instruction;

"c. Any service, treatment, advise or instruction for the purpose of appearance or skin enhancement, hair removal or replacement or personal grooming; or

"d. Professional social services, including:

"(1) Mental health services;

"(2) Crisis prevention services;

"(3) Foster care services;

"(4) Adoption service agencies;

"(5) Drug and/or alcohol rehabilitation services; or

"(6) Other social services described in the Declarations;

"2. The furnishing or dispensing of drugs or medical or dental, chiropractic or surgical supplies or appliances; * * *"

The professional services liability policy does not list the State of Oregon as an additional insured.

In November 2018, Juan Lopez-Robles was placed in the care of OYA. In January 2020, OYA moved Lopez-Robles to Haag. On March 15, 2020, three other residents convinced Lopez-Robles to take what they told him was Oxycontin but was actually Fentanyl. Later that evening, Haag staff checked the apartment where Lopez-Robles resided but failed to notice that he was unconscious and bleeding from his nose. Over the course of the next two hours, staff checked twice more, and twice more failed to notice Lopez-Robles' condition. At 12:32 a.m., another resident noticed his condition and called for help. At that point, staff called 9-1-1. Lopez-Robles was transported to a hospital, where he died of Fentanyl toxicity.

Carolina Robles, personal representative of the estate of Lopez-Robles, initiated a wrongful death action against Haag and OYA. The complaint alleged that Lopez-Robles died as a result of Haag's and OYA's negligence in failing to adhere to applicable "professional * * * standards" for supervising youths in their care. It further alleged that Haag allowed "rampant drug use" in its facility and failed

to notice Lopez-Robles' condition the night that he died. And it alleged that OYA was negligent in failing to supervise Haag. The complaint also alleged that OYA had violated Lopez-Robles' Eighth and Fourteenth Amendment rights to humane treatment while in the custody of the state by failing to comply "with professional and legal standards in the supervision" of Lopez-Robles.

OYA notified American of the complaint and demanded indemnity and assumption of defense under the provisions of the commercial general liability policy listing the state as an additional insured. American did not respond. Plaintiffs then initiated this action against American. The complaint specified that Haag had procured a commercial general liability policy, a professional liability policy, and an excess liability policy. It alleged that "there is no question that OYA was included as an additional insured on Haag's commercial general liability, professional negligence, and excess liability policies through American" and that American had breached those policies by failing to provide a defense to the wrongful death action.

B.  *Trial Court Proceedings*

American moved to dismiss the complaint on the ground that any liability under the commercial general liability policy arose from the failure to render a professional service, and the policy expressly denominates "assisted care living" as a type of "professional service." According to American, the only policy that might entitle OYA to coverage and defense is Haag's professional liability policy, but OYA is not listed as an additional insured on that policy.

Plaintiffs ultimately conceded that OYA is not listed as an additional insured on the professional liability policy. They nevertheless maintained that they were entitled to a defense from American because the exclusion for "professional services" in the commercial general liability policy does not apply. Plaintiffs argued that Haag's actions or inactions at issue in the wrongful death action did not involve "professional service." Plaintiffs reasoned that, although the commercial general liability policy declared that the term "professional service" included "assisted care living,"

the term "assisted care living" is ambiguous and therefore should be construed narrowly against American.[1]

The trial court granted American's motion to dismiss. The court's order explained that

> "the professional services exclusion endorsement found in the General Liability Policy \*\*\* expressly defines the services provided by Haag as 'professional services' which it then describes as 'Assisted Care Living.' Therefore, the exclusion negotiated and contracted in this general liability policy bars coverage."

The court noted that coverage was potentially available under Haag's professional liability policy, but OYA conceded that it was not listed as an additional insured on that policy. The court entered a limited judgment of dismissal dismissing plaintiffs' claims against American with prejudice.

## II.   DISCUSSION

A.   *The Parties' Arguments*

On appeal, plaintiffs argue that the trial court erred in dismissing their claims on the ground that the exclusion for "professional services" applies to the acts at issue in the wrongful death action. They reprise their argument that the policy terms "professional services" and "assisted care living" are ambiguous and should therefore be construed against American.

Concerning the asserted ambiguity of the two key policy terms, plaintiffs begin by contending that "professional services" reasonably could be understood to refer broadly to the services of a person engaged in a calling, vocation, or employment. Or it could refer more narrowly to services "characterized by and conforming to technical or ethical standards of a calling involving specialized training and knowledge."

Plaintiffs likewise assert that the term "assisted care living" could reasonably be understood to mean at least

---

[1] Plaintiffs also made an alternative argument that Hagg did not operate an "assisted care facility" within the meaning of the policy per the administrative rules. The trial court implicitly rejected that argument, and plaintiffs and American abandoned it on appeal, so we do not discuss it.

two different things. They contend that the phrase "assisted care living" could mean "to give support or aid by providing for or attending to the needs or performing necessary personal services for a living person." Or it could mean to "give support or aid by having responsibility for or attention to the safety and well-being of a living person."

Given the existence of such different definitional possibilities, plaintiffs argue, the policy must be construed against American unless something in the context of the policy suggests otherwise. In that regard, plaintiffs contend that nothing in the terms of the commercial general liability policy precludes the adoption of a narrower conception of the terms "professional services" and "assisted care living." In particular, plaintiffs argue that nothing in that policy contradicts a reading of the exclusion to apply only to types of "assisted care living" that involves highly specialized training or knowledge.

Plaintiffs argue that the context also "should include the definition of 'professional social or healthcare services' found in Haag's social service and healthcare professional liability policy." Plaintiffs point to the mention of such services as "medical, surgical, dental, x-ray, or nursing services," all of which require highly specialized training or knowledge.

At the least, plaintiffs conclude, the contextual information does not conclusively resolve the ambiguity inherent in the undefined terms "professional services" and "assisted care living" in the commercial general liability policy.

American responds that the allegations of liability in the wrongful death case fall squarely with in the exclusion in the commercial general liability policy for "'bodily injury' *** due to the rendering of or failure to render any professional service." According to American, the term "professional services" is a common one in the insurance industry and, as the Oregon Supreme Court held in *Multnomah Co. v. Oregon Auto Ins. Co.*, 256 Or 24, 28, 470 P2d 147 (1970), is broadly construed to apply to services that are "predominantly mental or intellectual rather than physical

or manual." American argues that the behavioral rehabilitation services that Haag provides easily satisfy that standard.

American adds that, in this case, the applicability of the "professional services" exclusion is made even more clear by the reference in the commercial general liability policy describing that term as applying to "assisted care living," a service that Haag undoubtedly provides.

In response to those arguments, at oral argument, plaintiffs took the position that it is not appropriate even to consider the professional liability policy. Such "extrinsic" evidence, plaintiffs suggest, is outside the scope of proper duty-to-defend analysis, which is confined to the allegations of the complaint and the terms of the policy at issue. When asked how they could take that position after expressly urging the court to take the professional liability into account, plaintiffs said that their earlier arguments may have been in error.

As for American's reliance on the broad definition of "professional services" in *Oregon Auto*, plaintiffs did not attempt to distinguish it. When asked at oral argument about the Supreme Court's decision, plaintiffs suggested that, in light of *Clinical Research Institute v. Kemper Ins. Co.*, 191 Or App 595, 84 P3d 147 (2004), the decision is of "limited value" because it was decided prior to later Supreme Court decisions setting out the proper analysis of duty-to-defend cases.

B. *Analysis*

1. *Applicable Legal Principles*

Whether an insurer owes a duty to defend is a question of law. *Allianz Global Risks v. Ace Property & Casualty Ins. Co.*, 367 Or 711, 744, 483 P3d 1124 (2021). The existence of such a duty is generally determined by comparing the allegations of the complaint with the terms of the insurance policy known as the "four-corners" or "eight-corners" rule. *West Hills Development Co. v. Chartis Claims*, 360 Or 650, 653, 385 P3d 1053 (2016). If the complaint alleges some claim that is covered by the policy, there is a duty to defend,

even if that complaint alleges other claims that fall outside the policy's coverage. *Id.*

Allegations of a complaint may fall outside of a policy's coverage either because "the allegations do not involve insured conduct or because one or more coverage exclusions in the policy absolve the insurer of its duty to defend." *Bighorn Logging Corp. v. Truck Ins. Exchange*, 295 Or App 819, 828, 437 P3d 287, *rev den*, 365 Or 195 (2019).

Determining the existence of a duty to defend necessarily entails interpreting the applicable provisions of an insurance policy. The overriding goal in interpreting the provisions of an insurance policy is to "ascertain the intention of the parties." *Dewsnup v. Farmers Ins. Co.*, 349 Or 33, 39-40, 239 P3d 493 (2010). That is accomplished by examining the express terms and conditions of the policy. *Hoffman Construction Co. v. Fred S. James & Co.*, 313 Or 464, 469, 836 P2d 703 (1992).

If the insurance policy itself supplies a definition for a term, we must apply that definition. *Hunters Ridge Condo. Assn. v. Sherwood Crossing*, 285 Or App 416, 422, 395 P3d 892 (2017). But, if a term is undefined in the policy, we determine whether it has a "plain meaning," that is, whether it is "susceptible to only one plausible interpretation." *Groshong v. Mutual of Enumclaw Ins. Co.*, 329 Or 303, 308, 985 P2d 1284 (1999). If the term has only one plausible meaning, then we apply it. *Id.* But, if it is ambiguous, we must examine it "in light of the particular context in which [it] is used in the policy and the broader context of the policy as a whole." *Holloway v. Republic Indemnity Co. of America*, 341 Or 642, 650, 147 P3d 329 (2006). If examining the context does not resolve the ambiguity, "any reasonable doubt as to the intended meaning of such a term will be resolved against the insurance company." *Id.* That is to say, the court will choose the meaning of the term that favors coverage. *Hoffman Const. Co.*, 313 Or at 469-70.

Determining the existence of a duty to defend also necessarily entails interpreting the applicable allegations of the complaint. Ordinarily, we read those allegations in the light most favorable to the policyholder: "If the complaint

can reasonably be interpreted to allege any basis that would fall within the policy coverage, then the insurer owes a duty to defend." *Rogowski v. Safeco Insurance Co.*, 306 Or App 505, 511, 473 P3d 111 (2020).

2. *Application*

The relevant allegations of the wrongful death complaint are that Lopez-Robles died because of Haag's and OYA's negligence in failing to adhere to applicable "professional * * * standards" for supervising youths in their care. It further alleges that Haag allowed "rampant drug use" in its facility and failed to notice Lopez-Robles' condition the night that he died. And it alleges that OYA was negligent in failing to supervise Haag. There is no dispute that, unless an exclusion applies, those allegations trigger American's obligation to defend against liability for "bodily injury," which the commercial general liability policy defines to include death. The question for us is whether those allegations in fact are subject to the policy's exclusion for liability resulting from the provision of "professional services."

Plaintiffs do not appear to contest that most of those allegations fall within the exclusion. Failing to supervise youths in accordance with "professional * * * standards" would seem clearly to be subject to the exclusion, for example, and plaintiffs do not argue the contrary. Failing to provide adequate oversight to prevent a drug overdose seems undoubtedly a failure to engage in "professional services," and plaintiffs do not appear to contest that either. Plaintiffs instead focus on the single allegation that OYA was negligent in failing to notice that Lopez-Robles needed medical care the night that he died.

We begin with the meaning of the term "professional services" as it is used in the commercial general liability policy. Plaintiffs spend much effort attempting to demonstrate that the plain meaning of the term "professional services" is inherently ambiguous, and therefore the policy must be construed against American. But, as we have noted, courts look to the plain meaning of a term in an insurance policy only if it is undefined. *Hunters Ridge Condo. Assn.*, 285 Or App at 422. Here, the policy expressly declares that "professional

services" refers to "assisted care living." The controlling question, then, is whether OYA staff, in failing to notice that Lopez-Robles needed medical care, was providing or failing to provide "assisted care living" services.

The ordinary meaning of "assisted care living" does not seem especially arcane. The ordinary meaning of "assist" is "to give support or aid." *Webster's Third New Int'l Dictionary* 132 (2002). The ordinary meaning of "care" when used as either a noun or a verb refers to providing for the "safety and well-being" of a person or being responsible for doing so. *Id.* at 338. And the reference to "living" appears to relate to the verb "live," which as relevant here, means "to continue alive * * * to maintain oneself: feed, subsist * * * to occupy a home." *Id.* at 1323.

Indeed, the dictionary supplies a definition for term "assisted living": "a system of housing and limited care that is designed for [individuals] who need some assistance with daily activities but do not require care in a nursing home and that usually includes private quarters, meals, personal assistance housekeeping aid, monitoring of medications, and nurses' visits." Thus, "assisted care living" as used in the insurance contract refers to the provision of, or the responsibility for providing, for the safety and well-being of those living at the Haag facility. The allegations of the wrongful death complaint seem to fall squarely within that understanding of the term "assisted care living." By neglecting to notice that Lopez-Robles required medical care, Haag staff failed to provide necessary assistance and care to one who lived at Haag's facility.

Plaintiffs offer two arguments to the contrary. First, they contend that the term "assisted care living" is inherently ambiguous. They argue that the term could reasonably be understood to mean "to give support or aid by providing for or attending to the needs or performing necessary personal services for a living person." Or it could mean to "give support or aid by having responsibility for or attention to the safety and well-being of a living person." After proffering those two definitions, however, plaintiffs fail to explain how they differ in any meaningful way. More importantly, plaintiffs do not explain why the allegation that Haag staff failed

to notice that Lopez-Robles required medical attention does not fall within *either* of those definitions of "assisted care living." As we have explained, establishing the ambiguity of a term in an insurance policy does not just mean that the insurer loses; it means that, as between the competing definitions of the term, the court will choose the one that favors the insured. *Hoffman*, 313 Or at 469-70. Here, plaintiffs lose under either of their proffered definitions of "assisted care living."

Second, they argue that the term "assisted care living" in the commercial general liability policy should not be understood to apply to all aspects of "assisted care living," but instead only those that entail the sort of specialized training or knowledge that would constitute "professional services." That argument, however, ignores the wording of the policy, which describes the term "professional services" as "assisted care living," not the other way around.

Plaintiffs suggest that the context of the commercial general liability policy—in the form of the professional services policy—supports that reading of the term. They contend that the professional services policy defines the "professional services" that it covers by referring to services that require a high degree of training and expertise, for example, "medical, surgical, dental, x-ray, or nursing services." Even assuming that we may consider the professional services policy as context, plaintiffs are too selective in their quotation from that policy. That policy also refers to a number of other services, including providing or failing to provide mental health services, crisis prevention services, foster care services, adoption services, health or therapeutic services, personal grooming services, and the furnishing of food or beverages.

Assuming for the sake of argument that plaintiffs are correct that the sort of "assisted care living" services that count here are those requiring "professional services," plaintiffs' arguments remain unavailing. That is because, when considering the meaning of the term "professional services" as used in a commercial general liability policy exclusion, we do not write on a clean slate. In *Oregon Auto*, Multnomah County had purchased liability insurance to cover employees of the sheriff's office from claims arising out of their

employment. 256 Or at 26-27. That policy had an exclusion for claims "due to the rendering of or failure to render any professional service." *Id*. at 27. The county took Barendrecht into custody and transported him to the county jail, where he told a medical technician that he was diabetic. *Id*. Later that day, Barendrecht felt ill and complained to a medical technician, who did nothing. *Id*. When he was released later that evening, Barendrecht fainted, and the technician gave him aspirin. *Id*. When his wife came to the jail, she found Barendrecht in incoherent condition. She took him to the hospital where he was found to be in a diabetic coma. *Id*. at 27-28.

Barendrecht sued the county and ultimately obtained a judgment against it. *Id*. at 26. The county then sued its insurance carrier, Oregon Auto, for the damages and the costs of defending the action. *Id*. Oregon Auto declined based on the exclusion for "professional services." *Id*. at 27. The county argued that giving insulin was something that Barendrecht himself could have done and thus did not constitute "professional services." *Id*. at 28. In the alternative, the county argued that the term is at least ambiguous and should be construed against Oregon Auto in favor of coverage. *Id*. at 29.

The Supreme Court rejected the county's contentions. The court held that the wording of the exclusion was "plain and unambiguous." *Id*. at 29. It explained that the term "professional services" encompasses an act "arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill, and the labor or skill involved is predominantly mental or intellectual rather than physical or manual." *Id*. at 28. The court borrowed that definition from *Marx v. Hartford Accident and Indemnity Company*, 183 Neb 12, 157 NW2d 870 (1968), widely regarded as the "pre-eminent decision" on the subject. *See, e.g.*, John Zulkey, *Does Your Claim Arise Out of Professional Services? Professional Liability Policies and Professional Services Exclusions?*, 3 Corp & Bus LJ 160, 163 (2022) (surveying more than 500 cases).

Applying that definition to the case at hand, the court said that the controlling issue was not whether anyone

could have administered insulin. Rather, it was whether particular training or skill was required when observing Barendrecht to ascertain whether he needed medical assistance. *Oregon Auto*, 256 Or at 28-29. Determining whether someone requires medical assistance, the court said, was a "professional service." *Id.* at 29.

*Oregon Auto* is on point here, where the issue is whether failing to observe that Lopez-Robles required medical assistance was a failure to provide a "professional service" within the meaning of Haag's commercial general liability policy.

Plaintiffs' position with respect to *Oregon Auto* is difficult to pin down. In their briefing, they briefly cite the decision as supporting their contention that "professional services" require some measure of specialized knowledge, labor, or skill. At the same time, however, they make no effort to explain how the court's application of that test to the facts of that case is not controlling here. When asked about that at oral argument, plaintiffs suggested that *Oregon Auto* is of "limited assistance," because it predates more recent Supreme Court case law setting out the proper interpretive analysis of insurance policies. Cited in support of that assertion is this court's decision in *Clinical Research*. That response, however, is problematic for several reasons.

First, plaintiffs' reading of *Clinical Research* is not quite correct. At issue in that case was the meaning of an exclusion in a commercial general liability policy. 191 Or App at 598-99. We applied the interpretive principles described above. *Id.* at 599-605. In a footnote, we observed that, in engaging in that analysis, we did not rely on decisions from *other jurisdictions*, because none of those decisions applied the method of analysis required by Oregon case law. *Id.* at 605 n 4. We did not mention *Oregon Auto*, much less question its continuing value.

Second, plaintiffs have not explained why the court's analysis in *Oregon Auto* is at odds with current case law on the proper interpretation of insurance policies. The court in *Oregon Auto* determined that the term "professional services," as used in the policy at issue there was "plain and

unambiguous," which determination is precisely what current case law requires. At oral argument, plaintiffs did suggest that the court in some way failed to adequately consider the text of the policy at issue in that case. But they offered no explanation as to which other parts of the text the court should have considered, much less explain how considering such additional text would have altered the court's decision.

Third, whatever analytical shortcomings *Oregon Auto* may entail, it is worth noting that the Oregon Supreme Court has continued to rely on that decision and its definition of "professional services" as recently as *McLean v. Buck Medical Services, Inc.*, 334 Or 17, 41, 45 P3d 120 (2002). This court did likewise in *Hedmann v. Liberty Mutual Fire Ins. Co.*, 158 Or App 510, 514 n 3, 974 P2d 755 (1999).

Aside from all that, the critical point is not *Oregon Auto's* definition of "professional services." As we have noted, plaintiffs agree with that. The issue is the court's determination that failing to notice that someone is in need of medical care is a failure to provide such a "professional service." And plaintiffs have nowhere explained why that holding is not applicable here.

## C.  *Instructions on Remand*

One final issue requires brief discussion. American moved to dismiss plaintiffs' complaint, including the declaratory judgment claim. And the trial court granted that motion and entered judgment accordingly. "Declaratory judgment actions are generally not the proper subject of a motion to dismiss unless there is 'want of a justiciable controversy.'" *Petix v. Gillingham*, 325 Or App 157, 165, 528 P3d 1152 (2023) (quoting *Doe v. Medford School Dist. 549C*, 232 Or App 38, 45, 221 P3d 787 (2009)). The proper procedure is to submit the matter to the court for a declaration as to the merits of the claim. *Doe*, 232 Or App at 46. Nevertheless, when the trial court has dismissed a declaratory judgment claim and that dismissal is clearly based on a determination of the merits of the claim, our practice has been to review that determination as a matter of law and then remand for entry of a judgment declaring the rights of the parties in accordance with our opinion. *Id*. Given that it is clear in this

case that the trial court dismissed plaintiffs' declaratory judgment based on its determination of the merits, we follow our practice of remanding for entry of judgment declaring the rights of the parties in accordance with this opinion.

As to plaintiffs' claim for declaratory relief, vacated and remanded for entry of a judgment declaring the rights of the parties; otherwise affirmed.